NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

METAL CONTAINER CORPORATION, Respondent,

International Brotherhood of Electrical Workers, Local No. 1, AFL–CIO, Intervenor/Petitioner.

No. 80–1782.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1981.

Decided Oct. 7, 1981.

Frederick Havard, Atty., argued, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., for petitioners.

Charles A. Werner, argued, Tara, Levy, Schuchat, Cook & Werner, St. Louis, Mo., for intervenor-petitioner Local No. 1, Intern. Broth. of Elec. Workers, AFL–CIO.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P. A., Paul A. Saad and Terence M. Brown, argued, Tampa, Fla., for respondent.

Before ROSS and ARNOLD, Circuit Judges, and HANSON,* Senior District Judge.

ARNOLD, Circuit Judge.

The National Labor Relations Board petitions this Court for enforcement of its order of June 12, 1980, ordering Metal Container Corporation to cease and desist from refusing to bargain collectively with the International Brotherhood of Electrical Workers, Local No. 1 (IBEW), as the exclusive bargaining representative of the production-support electricians at its Arnold, Missouri plant. The company's refusal to bargain is based on its contention that a separate unit of maintenance electricians at this facility is inappropriate and that the only appropriate unit is a "wall-to-wall" production-and-maintenance unit. We enforce the Board's order.

I.

Metal Container Corporation's facility at Arnold, Missouri, manufactures two-piece aluminum beer cans for its parent company, the Anheuser-Busch Corporation. The Arnold facility is a high-speed, totally automated plant with three computer-controlled production lines, each of which has the capacity of making 800 cans a minute. The plant operates 24 hours a day, seven days a week. This is a new plant with no prior bargaining history.[1] The Arnold facility is the newest of three beer-can manufacturing facilities operated by the Company, the other two being located in Jacksonville, Florida, and Columbus, Ohio. Employees in those two plants, which also use the two-piece manufacturing process, are represented on a plant-wide, "wall-to-wall" basis with no separate craft units.

---

* The Hon. William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. Four other unions petitioned for plant-wide production-and-maintenance units. The United Steelworkers of America and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers intervened in the representation proceeding in support of the company's contention that only a wall-to-wall unit was appropriate. They are not parties to this enforcement proceeding.

Nationwide, 71 out of 72 can plants using the two-piece process[2] have wall-to-wall production-and-maintenance units. The one two-piece plant with a separate electricians' unit is located in St. Louis, Missouri, and this separate unit is an extension of the bargaining structure already in place at a three-piece plant operated by the same company, American Can Corporation.[3] In the plants which manufacture cans using the three-piece process, there is a history of separate craft units. The three-piece process is not a high-speed or highly integrated manufacturing procedure. It is not a continuous-flow process, and various phases of production can be interrupted without adversely affecting other phases. Jobs are more compartmentalized. The two-piece process, on the other hand, is a completely automated, continuous-flow manufacturing process. The equipment is closely coupled in a continuous line, and all production equipment is controlled by a central computer. Raw materials fed into machines emerge twenty-five minutes later as finished beer cans complete with lithographed labels.

The IBEW represents approximately 800 maintenance electricians in the St. Louis, Missouri, area. Three electrician bargaining units represented by the IBEW are at three-piece can plants, and the fourth is at the two-piece American Can plant where a separate bargaining unit was established by agreement of the parties. The union maintains an apprenticeship program.

The production-support electricians at the Arnold facility spend approximately 80% of their time doing preventive maintenance on the production line. The maintenance is scheduled by the electrical supervisor days or even weeks in advance and is done in accordance with a written check list. There was conflicting testimony as to the degree of skill required to perform this job. The electrical engineer described the work as repetitive and routine. Members of the proposed unit testified that it required a high degree of skill and knowledge of the electrical field. While performing preventive maintenance, the electricians work alone, although they may talk with the production workers in attempting to determine how a machine is operating and whether there is any malfunction or trouble. There was testimony that 50% of this preventive maintenance work is non-electrical or requires a combination of skills involving mechanical, pneumatic, hydraulic, and electrical systems. The other 20% of the electricians' time is spent in the separate electrical shop making repairs, on the production line troubleshooting, or making repairs in other parts of the plant.[4]

The company does not require journeyman status or licensing of applicants. Company officials testified that they looked for basic electrical skills plus experience in other areas such as mechanical, hydraulic, and pneumatic systems. Experience in another high-speed manufacturing process is also considered valuable. The plant's electrical engineer who participated in the interviewing process testified that applicants were questioned about their electrical knowledge, and that the four electricians hired were "highly skilled."

The electricians are supervised both from within and from outside their craft. Their preventive-maintenance schedules are prepared by the electrical supervisor, and he and the electrical engineer are in the plant

---

2. The two-piece process produces a seamless can with an integral bottom and an aluminum top. The older three-piece-can process produces a can with a separate bottom which is assembled by the customer.

3. Before the hearing officer the parties stipulated that the separate electricians' unit at the new American Can plant in St. Louis was formed by agreement of the parties without Board sanction or approval.

4. The electricians are responsible for maintenance and repair of all electrical equipment in the plant, not just the production line. When there is a malfunction on the line, the computer signals the area where the problem is occurring. It is then up to the electrician to diagnose the problem. Defective parts are quickly removed to prevent shutting down the line. Repairs are then made either in the shop or, if necessary, the part is returned to the manufacturer for repair.

available to supervise or give technical advice to the electricians from 8 to 5 Monday through Friday. Since the plant operates continuously, however, some of the electricians on the night shift may not see either the electrical supervisor or the engineer for two or three weeks at a time. The two shifts are over-lapped by thirty minutes for a joint meeting of incoming and outgoing workers. The meetings provide continuity and allow those who have just finished their shift to brief those coming on about possible problems. These meetings are conducted by the production supervisor, and the electricians are required to attend. While working on the production line doing maintenance, the electrician is not closely supervised and essentially works alone, but if supervision is needed, it is provided by the shift superintendent. The shift superintendent has the authority to countermand the electricians' written instructions and also to discipline them up to and including dismissal, though this authority is rarely exercised. The two electricians assigned to each shift work separately, not together, and come in contact with production workers frequently.

Both the physical layout and the personnel structure of the plant are designed to foster an integrated work environment in which all employees, both production and maintenance, work together to maintain the uninterrupted operation of the production line. The company has a program for cross-training employees in aspects of production outside their regular assignments. The cross-training has a limited effect on the electricians' craft status. Employees in other classifications have not been trained to do major electrical work; and the production-support electricians, after initial training, will work on the production line only in emergencies. On days known as "maintenance day" one of the three lines is closed down for complete inspection and maintenance. On those days, the electricians will work with other employees in teams. Only electricians perform major electrical repair work.

All conditions of employment and fringe benefits are uniform for hourly employees throughout the plant. All use the same entrance and punch the same timeclock. Production-support electricians have the top pay scale for hourly employees, and have a separate wage scale and progression rate.

After a hearing, the Regional Director issued his decision and direction of election in which he found that the electrician unit petitioned for by the IBEW was an appropriate unit, and that it would be separately certified if the maintenance electricians voted for the IBEW in the required election.[5] The company filed with the Board a request for review of the decision, which was denied for failure to raise substantial questions requiring review. At the election on October 31 and November 1, 1980, the production-support electricians voted four to nothing in favor of IBEW representation. After certification of the IBEW by the Regional Director, the company refused to bargain. (Bargaining has commenced with the union representing the production-and-maintenance unit). On January 2, 1980, the IBEW filed an unfair-labor-practice charge against the company, which the Board upheld on summary judgment. This enforcement procedure followed.

## II.

Although the company makes numerous arguments challenging the Board's characterization of the evidence and alleged failure to weigh competing factors, we think that this case hinges on one basic question: Whether the highly integrated nature of the company's operation has destroyed the community of interest necessary to support the designation of a separate craft unit.[6]

---

5. The electricians had the choice of voting for separate representation, or for representation in the production-and-maintenance unit, or for no union.

6. A true craft has been defined as a unit consisting of "a distinct and homogeneous group of skilled journeymen craftsmen, working as such, together with their apprentices and/or helpers. To be 'a journeyman craftsman,' an individual must have a kind and degree of skill

■ Both section 9(b) of the National Labor Relations Act[7] and a long line of Board precedents recognize that the special interests of skilled craft employees may warrant a separate bargaining unit for such employees. *See, e. g., Atlantic Richfield Co.*, 231 N.L.R.B. 31 (1977). The Board and the courts have developed a "community of interest" analysis to guide the Board in selecting viable bargaining units that will effectuate the section 7 policy of employee self-determination. See, *e. g., NLRB v. J. C. Penney Co.*, 559 F.2d 373, 375 (5th Cir. 1977). The most common community-of-interest factors are "such factors as bargaining history, operations integration, geographic proximity, common supervision, similarity in job function, and degree of employee interchange."[8] *Ibid.* Craft-unit determinations are made on a case-by-case basis after a weighing of all relevant factors, and no rigid test can or should be devised. *Mallinckrodt Chemical Works, supra*, at 398.

■ Review of the Board's unit certification is limited to a determination of whether the decision is arbitrary, capricious, an abuse of discretion, or lacking in substantial evidentiary support. *NLRB v. Target Stores, Inc.*, 547 F.2d 421, 423 (8th Cir. 1977). To set aside a Board certified unit, the employer must show that the designated unit is not appropriate. It is not enough to show that another kind of unit would have been more appropriate. *NLRB v. J.C. Penney Co., supra*, 559 F.2d at 375. A reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matters been before it de novo." *Hy-*

*Vee Food Stores, Inc. v. NLRB*, 426 F.2d 763, 764 (8th Cir.), *cert. denied*, 400 U.S. 879, 91 S.Ct. 120, 27 L.Ed.2d 116 (1970), quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

The Regional Director weighed the relevant factors as follows (citations omitted):

In view of the record as a whole, including the fact that there is no history of bargaining in a plant-wide unit including the production support electricians at the Employer's Arnold, Missouri, Facility, although there is a plant-wide unit history of bargaining at the Employer's two other facilities and at 71 2-piece can plants in the United States, and a separate maintenance electrician craft unit history of bargaining in 4 can plants in the St. Louis Metropolitan Area, one of which is a 2-piece can plant, the fact that the IBEW has a specialized experience representing maintenance electricians, the fact that the production support electricians are highly skilled electricians, exercise substantial independent judgment in the performance of their work, and are the only classification which performs major electrical repair work, and the fact that production support electricians are primarily supervised within their own craft lines, and despite the integrated nature of the Employer's operation, the fact that production support electricians will routinely perform work not traditionally categorized as electrical, the production support electricians' contact with other employees, the similarity of their benefits and working conditions with those enjoyed by other employees, the Employer's policy of

which is normally acquired only by undergoing a substantial period of apprenticeship or comparable training." *American Potash & Chemical Corp.*, 107 N.L.R.B. 1418, 1423 (1954).

7. 29 U.S.C. § 159(b), in part, provides: "The Board shall decide in each case whether, in order to assure the employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant, or subdivision thereof. . . ."

8. When a union seeks to carve out a unit of craft workers from a previously established collective-bargaining unit, the Board is guided by *Mallinckrodt Chemical Works*, 162 N.L.R.B. 387, 397 (1966). While not controlling in a non-severance situation, the *Mallinckrodt* test has been applied by the Board in determining whether an appropriate craft unit should initially be established. *Anheuser-Busch, Inc.*, 170 N.L.R.B. 46 (1968).

cross-training employees, the lack of a requirement that production support electricians be journeymen, and the fact that the production support electricians may receive some supervision from outside their craft, I find that the production support electricians constitute an appropriate craft unit.

██ After reviewing the evidence presented to the Regional Director, we are convinced that the production-support electricians at the company's Arnold plant have retained sufficient characteristics of a separate craft unit to justify the Board's certification under our limited scope of review. There is no rigid rule that a high-speed industrial environment automatically destroys a separate community of interest among craft workers. The Board addressed this contention in *Atlantic Richfield*:

> Where . . . there is no history of bargaining on a more comprehensive basis, neither the integrated nature of a production process nor the fact that skilled employees must coordinate their operations with other employees in achieving maintenance goals is, in itself, sufficient to preclude the formation of a craft unit.

*Atlantic Richfield Co., supra,* 231 N.L.R.B. at 32. Integration of a manufacturing process is one factor to be considered in unit determinations.

> But it is not in and of itself sufficient to preclude the formation of a separate craft bargaining unit, unless it results in such a fusion of functions, skills, and working conditions between those in the asserted craft group and others outside it as to obliterate any meaningful lines of separate craft identity.

*E.I. DuPont de Nemours and Co.,* 162 N.L. R.B. 413, 419 (1966). We think the Board has permissibly found that the Arnold plant's mode of operation has not so fused "functions, skills, and working conditions" as to preclude a separate craft unit. We rely particularly on the fact that the electricians are the *only* plant employees who make major electrical repairs and have primary responsibility for the electrical maintenance of the entire plant. Plant officials testified that at the first sign of trouble on the line the electrician is the first person called, because he has the greatest skill in diagnosing production malfunctions. There is ample evidence that the electricians exercise independent judgment in determining when, where, and in what order repairs will be made. The electricians' supervisors seemed to take pride in the sophisticated combination of skills required to keep the electrical components of the computer-controlled production line running smoothly. The fact that the electricians do most of their electrical work in the production area does not prevent them from being a "distinct and homogeneous group of skilled journeymen craftsmen." While the electricians are required to have knowledge of mechanical, pneumatic, and hydraulic components, they use these skills within the context of their primary function at the plant—electrical maintenance. The requirement that they have other skills in addition to electrical knowledge does not diminish the fact that the core requirement for the job was extensive training and/or experience as electricians.[9]

Metal Container cites three cases as governing Board precedent. *Joseph Schlitz Brewing Co., Container Division,* 192 NLRB 553 (1971); *Kaiser Aluminum & Chemical Corp.,* 177 NLRB 682 (1969); *Joseph Schlitz Brewing Co.,* 16–RC–4263 (1966) (unreported decision). In each of these cases the Board denied separate craft units in plants using the two-piece process. Metal Container contends that the Board's decision in the present case is an arbitrary departure from these precedents. When the Board departs from prior precedent without explanation, its decisions have been held arbitrary as a matter of law. *NLRB v. Meyer Label Co.,* 597 F.2d 18 (2d Cir. 1979).

---

**9.** All four electricians hired at the time of the hearing had extensive training and experience which will not be recounted here. The lack of a formal apprenticeship or training program does not bar a craft determination when extensive experience is required. No other class of employees is required to have electrical knowledge.

After reviewing the Board's decisions in these three cases, we conclude that none of them represents inescapably conflicting Board precedent. In the 1971 *Schlitz* case the electrical and electronic repairmen worked with production employees 85 to 90% of the time, shared common work benches, frequently interchanged job functions, and were not required to have any special education or experience for the job. In the 1966 *Schlitz* case the electricians seeking separate craft status were hired "to perform a broad spectrum of overall maintenance functions," and their duties were found by the Board to be "not sharply distinguishable from those performed by other maintenance employees."[10] In *Kaiser*, a separate lithographers' unit was requested. The lithographers worked directly on the production line, were not separately supervised, spent a substantial amount of time on nonprinting tasks, and used a dry-offset process which required less skill than traditional lithographic printing. We cannot say that the facts in these three cases are "indistinguishable from the facts present here," as the Second Circuit found in *Meyer Label Co., supra*, 597 F.2d at 20. None of the Board's decisions involving two-piece can plants rules out the appropriateness of a separate craft unit in all such plants. Each plant has its own characteristics, and, while the overwhelming trend in the industry, nationwide, is toward wall-to-wall production-and-maintenance units,[11] that is but one factor to be considered by the Board when it focuses upon a particular plant and its employees.

Metal Container also calls our attention to a recent Board decision denying a sepa-

rate electricians' craft unit in another highly integrated manufacturing industry. *Procter & Gamble Paper Products Co.*, 251 N.L.R.B. 77 (1980). Several factors distinguish the *Procter and Gamble* decision. There the Board found that 50% of the electrical work in the plant was performed by over 200 other technicians who had some electrical skills. While the Procter and Gamble electricians were the most highly skilled electricians in the plant and spent 100% of their time doing electrical work, they worked in teams with other maintenance and production workers and did not function as a separate group. There was also movement in and out of the unit, with production workers moving into the electrician jobs. Here, in contrast, all four electricians were hired as electricians, they are responsible for all the major electrical repair work, they do not work in teams except on "maintenance day," and there has been no movement into or out of the class. On the whole, this case is closer, on its facts, to other craft unit certification cases in which the Board has certified a separate craft unit. *Lianco Container Corp.*, 177 N.L.R.B. 907 (1969) (only electricians in the unit perform electrical work; no apprenticeship but electrician experience required); *Atlantic Richfield Co.*, 231 N.L.R.B. 31 (1977) (unit employees hired as skilled employees, no transfers out of unit, most electrical work done by unit employees); *Anheuser-Busch, Inc.*, 170 N.L.R.B. 46 (1968) (experience and license required; highly integrated production line does not obliterate separate craft identity).

In summary, we hold that there is substantial evidence in the record as a whole to

---

**10.** Only one paragraph of the 1966 *Schlitz* decision is devoted to the petition for a separate electricians'. unit. There is insufficient information from which to make a detailed comparison with the present case.

**11.** In response to our post-argument order of June 16, 1981, the Board has filed an analysis of the 73 two-piece can manufacturing plants known to have bargaining units. Relevant information was unavailable for 36 of the plants. In 26 plants a wall-to-wall unit was stipulated to by the parties and approved by the Board. Several units were established by Board deci-

sions in which separate craft status was not an issue. In five cases the Board denied separate craft status. Three of these cases involved lithographers, one was a request for a separate maintenance unit, and the other was the 1966 *Schlitz* case discussed above. The three lithographer cases and the maintenance case are of limited relevance to the issue of the appropriateness of a separate electricians' unit. In another *Schlitz* case, No. 12–RC–1126 (1961) (unreported decision), the Board found a separate unit of electricians appropriate and capable of severance from a maintenance unit.

support the Board's conclusion that the production-support electricians at the company's Arnold facility are an appropriate collective-bargaining unit. We base that conclusion on the fact that despite the highly integrated nature of the plant's operation the electricians are highly skilled, highly paid workers who exercise independent judgment and who are primarily supervised from within their own craft. We recognize, of course, that a plant-wide unit would also have been appropriate. When two or more units are appropriate, employee choice is a relevant factor. *Pittsburgh Glass Co. v. NLRB*, 313 U.S. 146, 156, 61 S.Ct. 908, 914, 85 L.Ed. 1251 (1941).

Accordingly, we enforce the Board's order.

ROSS, Circuit Judge, concurring.

In my opinion, the decision of the Board to certify IBEW as the representative of a separate unit (of four electricians) is both unwise and in direct opposition to the practice of 71 of the 72 plants engaged in wall-to-wall production using the two-piece process, including Metal Container's other two plants. (See pp. 1310 and 1311 of this opinion.)

Inasmuch as consistency in making such unit determinations is neither followed by the Board nor required under many of the applicable cases, I find myself having to agree that the substantial evidence rule has been minimally complied with here even though its application is an affront to ordinary logic and common sense. The practical result will be to give the IBEW unit of only four employees an inordinate amount of leverage in contract negotiations even though a substantial majority of the 110 production employees may have ratified a negotiated labor agreement.