**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MEYER LABEL COMPANY, INC., Respondent.**

**No. 303, Docket 78-4107.**

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1978.

Decided April 6, 1979.

David Fleischer, Atty., Washington, D. C. (Marjorie S. Gofreed, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for petitioner.

Joel H. Golovensky, Mineola, N. Y. (Rains, Pogrebin & Scher, Mineola, of counsel), for respondent.

Before LUMBARD, MOORE and GURFEIN, Circuit Judges.

MOORE, Circuit Judge:

The petitioner, the National Labor Relations Board (the Board), seeks enforcement, pursuant to § 10(e) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(e) (1976), of its order dated March 17, 1978 and reported at 235 N.L.R.B. No. 28. The Board ordered the respondent, Meyer Label Company, Inc. (the Company) to cease and desist from refusing to bargain with Local One, Amalgamated Lithographers of America, affiliated with International Typographical Union, AFL–CIO (the Union), in violation of §§ 8(a)(5) and (1) of the NLRA, 29 U.S.C. §§ 158(a)(5) and (1) (1976).

The sole question in this enforcement proceeding is the propriety of the Board's decision to grant the Union's petition seeking a separate bargaining unit composed only of the Company's lithographic production employees. We hold, based on examination and consideration of the record as a whole, that the Board's order is not supported by substantial evidence and is arbitrary and unreasonable. We therefore deny enforcement of the Board's order.

### I.

The Company is a New York corporation engaged in specialty printing for customers throughout the world. Its principal place of business and its offices are located on various floors of three contiguous buildings on East 16th Street in New York City. The Company employs approximately thirty persons and is engaged primarily in printing labels and patches on fabrics, using letter presses, offset presses, and cutting and dyeing machines. Four employees in the art department (located on the seventh floor of 5 East 16th Street) perform the preparatory work, such as the designing of labels, filming, lithographic stripping, platemaking, and various other tasks preparing the product for either the offset or letter press. Fabric for the labels is cut by machines operated by about seven employees on the third and fourth floors of all three buildings. The cut fabric and lithographic plates are then sent to the printing area (located on the third floor of 5 and 7 East 16th Street), which contains seven or eight offset presses, seven letter presses, and seven cutting machines. Seventeen employees

work in this area. After the labels have been printed on the fabric, the materials are sent to the shipping department (located on the fourth floor) for handling and packing.

The Union sought to certify as a collective bargaining unit employees performing duties primarily related to the offset (lithographic) presses. To this end, the Union filed a petition for an election of a unit of the Company's lithographic production employees. A full hearing on the petition was held before the Acting Regional Director of the NLRB, Region 2, to whom the Board had assigned the case for a hearing. On June 6, 1977, the Acting Regional Director dismissed the Union's petition for certification.

The Acting Regional Director found, *inter alia,* that the Company's "production process is highly integrated"; that there is "some interchange and transfer among the employees"; that "[a]ll employees share the same facilities and are in constant contact with each other"; that "wage ranges are similar for all employees and hours, vacations and holidays are the same"; and finally, that there is "no separate supervision for the employees [the Union] seeks to represent". He therefore concluded that the requested unit was inappropriate for collective bargaining purposes.

The Board, after considering the entire record in the case, including a brief on review filed by the Company, made its own findings and reversed the decision of the Acting Regional Director. It found a bargaining unit consisting of eight of the Company's approximately thirty employees. Of the eight, six were employed as lithographic press operators in the seventeen-person printing operation and two worked in the four-person art department and were engaged in lithographic camera work and platemaking. The Board directed an election and the Union won. It was then certified as the exclusive bargaining representative of the eight lithographic production employees.

The Company refused to bargain with the Union, however, claiming that the Board's unit determination was improper. The Union filed a charge alleging that the Company violated §§ 8(a)(5) and (1) of the NLRA by refusing to bargain with the Union. The Board found the Company in violation of the NLRA and issued an order requiring the Company to cease and desist from its refusal to bargain and from interfering with employees' exercise of their Section 7 rights. Affirmatively, the order required the Company to bargain with the Union upon request, to embody any understanding reached in a signed agreement, and to post the appropriate notice. We must now consider whether the Board's order ought to be enforced.

## II.

Our authority to review Board findings is narrow. *Niagara University v. NLRB,* 558 F.2d 1116, 1118 (2d Cir. 1977). In determining an appropriate bargaining unit, the Board has wide discretion and its decision will rarely be disturbed. *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). However, where the Board's order is not supported by substantial evidence in the record as a whole or is either arbitrary, capricious, or unreasonable, we will deny enforcement. *Niagara University v. NLRB, supra,* 558 F.2d at 1118. In addition, we recently held, in *Szabo Food Services, Inc. v. NLRB,* 550 F.2d 705, 709 (2d Cir. 1976), that if the "factors identified and relied on by the Board do not amount to the 'substantial justification' required to 'fractionate a multi-unit operation whose labor policy is centrally directed and administered,'" enforcement will be denied. (citations omitted).

We hold that the Board's order in the instant case should not be enforced. Viewing the record as a whole, we find no substantial evidence to support the conclusions reached by the Board. Moreover, the Board's order was arbitrary because it departed from Board precedents, the facts of which are indistinguishable from the facts present here. *Amalgamated Clothing Workers of America v. NLRB,* 491 F.2d 595, 598–99 (5th Cir. 1974). *See Continental*

*Can Co.,* 171 N.L.R.B. 798 (1968); *Weyerhaeuser Co.,* 142 N.L.R.B. 1169 (1963); *Pacific Press, Inc.,* 66 N.L.R.B. 458 (1946).

In *Continental Can, supra,* the Board determined that a separate unit composed of the company's lithographic production employees was inappropriate for collective bargaining purposes. In reaching that conclusion, the Board identified and relied on the following factors: (1) the lithographers were not separately supervised but instead worked under the same general and immediate supervision with all the other production employees; (2) the offset pressmen spent a substantial amount of time performing other nonprinting duties and directing operation of machinery other than lithographic equipment; (3) the lithographers did not work in a separate location, but, on the contrary, worked on production lines along with nonlithographic employees; and (4) all employees used the same locker room, canteen, parking lot, plant entrance, and timeclock.

In *Weyerhaeuser, supra,* the Board concluded that a unit of lithographic production employees could not be severed from the other workers in the plant. The Board focused on the "substantial interchange" of jobs between the offset and other press workers, resulting in a single printing department with "common immediate supervision". In addition, the Board there found that "[a]ll printing department employees . . . [were] treated uniformly . . . for purposes of determining seniority with respect to such matters as promotions, layoffs, and vacation preferences". Moreover, working hours and fringe benefits were the same for all employees.

Finally, in *Pacific Press, supra,* the Board ruled that the lithographic employees did not possess a sufficiently separate community of interests to warrant their establishment as a separate bargaining unit. The Board looked primarily at the Company's specific organizational structure and found that "business exigencies" resulted in substantial interchange of employees between the offset and other presses.

The same factors which militated against a finding of proper unit determination in the Board precedents described above are present here. In this case, the Board did not adequately consider the Company's specific structure and mode of operations. The Company is a small specialty printing firm consisting of only thirty employees. It has organized its operations so that its employees can perform as many different functions as possible. Because of the varied nature of the Company's products, the erratic and unpredictable work flow from one type of printing to another and the Company's efforts to cover absenteeism and minimize layoffs, interchanges of jobs among *all* employees, including the lithographers, is, of necessity, constant and extensive. When market demand for one kind of product is high, the Company can easily move employees from one job to another, thereby obtaining the maximum number of workers to produce the needed item. The Company accepts jobs and plans its production on the very basis of flexibility and overlap in skills amongst its workers, and functions essentially as an integral unit. We therefore conclude that the Board's finding that interchange between the offset operators and the Company's other employees is only "infrequent", was not supported by substantial evidence in the record. Nor does substantial evidence support the Board's conclusion that interchange occurs only in emergency situations or when a lithographic run has ended.

The Board determined that two of the four employees in the art department were to be included in a separate bargaining unit with the six printing area employees who most frequently operate offset presses. There is no substantial evidence to support this conclusion. The art department is a separate unit of the Company's operations and its four employees function as a single integral unit. All four employees work on art eventually destined for the offset presses. Additionally, since some jobs can be done on either offset or letter press machinery (depending on other demands within the Company), the four art department employees prepare the product for either the offset or letter presses.

The Board also failed to accord sufficient weight to the centrality of the supervision in the Company's small plant. The Board's determination that the Company itself recognized separate functional areas or departments, including offset, by designating certain employees as immediate foremen or supervisors of the respective employees, is not supported by substantial evidence in the record as a whole. In fact, a single plant supervisor directs all of the Company's employees, and titles bear no relation to the work supervised. The Company's managerial structure and labor relations policy is completely integrated. No formal training or apprenticeship program exists, and employees are, for the most part, hired without any experience and trained on the job. In addition, because of the frequency of interchange and transfer, employees who are hired primarily for one function are very often assigned to other functions.

In finding a separate community of interest among eight employees (of the Company's total of thirty employees) who do lithographic work, the Board gave insufficient weight to the uniformity of treatment of the Company's personnel. All employees work the same hours, receive the same sick-pay benefits, are entitled to promotions, vacations, and life insurance in accordance with their plant-wide seniority, and share the same locker room and other facilities. Salaries are similar for all employees and do not relate to the frequency of assignment to any machine.

Finally, the physical layout of the Company's plant is such that the letter and offset presses and other types of machinery in the printing area are located in close proximity to one another. Physical separation is thus precluded between the lithographers and the Company's other workers. All the printing area employees work side-by-side with each other, developing identity of interests and common concerns wholly apart from the Company's reasons for interchange and transfer.

Further, sheer havoc might result if the six people treated as lithographic pressmen and the two art department employees were permitted to bargain separately. The Company might be forced to restructure its operations and reorganize its production. Other employees similarly situated, i. e., those employees who frequently operate offset presses and engage in art preparation for offset work, might be adversely affected because they might have their conditions set by a union which does not represent them. Conversely, those employees included in the unit either might not be assigned to other jobs or, if they were so assigned, the conditions for nonunit work might be bargained by a union representing only those eight employees in the bargaining unit. In so small a plant, these restrictions and impediments might make it impossible for the Company to continue its present operations. Moreover, if another union should try to unionize the entire shop, the presence of two separate units in this small company might pose additional difficulties.

In sum, we hold that, when the record is viewed as a whole, substantial evidence does not support the Board's determination that the bargaining unit in question is appropriate for collective bargaining purposes of the Company's lithographic production employees. Moreover, the Board's decision was arbitrary because it was contrary to its past precedents involving similar unit determinations.

The Board's application for enforcement of its order is therefore denied.