**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GREENSBORO NEWS & RECORD, INC. Respondent.**

**No. 87–3565.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1988.

Decided April 4, 1988.

Ronald Alan Lindsay (Seyfarth, Shaw, Fairweather & Geraldson on brief), for respondent.

Christopher Warren Young, N.L.R.B. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Susan L. Williams, Supervisory Atty. on brief), for petitioner.

Before POWELL, Associate Justice (retired), United States Supreme Court,

sitting by designation; ERVIN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

ERVIN, Circuit Judge:

The Greensboro News & Record, Inc., ("the newspaper") was adjudged guilty of committing unfair labor practices by the NLRB because of incidents involving three employees at its Greensboro, North Carolina plant. On September 19, 1984, the Board ruled that by discharging James Roberts on September 28, 1982, the newspaper violated sections 8(a)(1) and (3) of the NLRA, as amended, 29 U.S.C. § 158(a)(1), (3).[1] The company was also adjudicated to have violated section 8(a)(1) by issuing a warning to and threatening Jane Allen, and by unlawfully interrogating Leigh Ann Lovings. The Board's decision is reported at 272 N.L.R.B. 135.[2] The Board now petitions the court to enforce its 1984 order. We decline such an invitation.

I.

James Roberts has been president of the local union, Local 319, since 1979. He is employed as a journeyman pressman who moves around the pressroom doing various jobs. On September 28, 1982, he was the only person working in the reel room. His foreman, Clayton Patteson, was in a differ-

ent room. Patteson, a pressman for 38 years, had been in the union himself for 20 of those years. Patteson had to go to the reel room four times because of equipment malfunctions. After the fourth malfunction, Patteson noticed what appeared to be a deliberate cut in a roll of newsprint. Such a cut would halt the machinery and bring production to a standstill.

Patteson called on his supervisor, Lawrence Emery, and together they met with Roberts. Patteson fired Roberts on the spot for sabotage. Later, the vice president for operations, Richard Hendricks, upheld the dismissal after a grievance meeting with Roberts and others. The number of malfunctions decreased dramatically. The Board ruled that this discharge was motivated by anti-union animus.

Wholly separate violations, occurring some three months before Roberts' discharge, involved Jane Allen, a union supporter, who worked in the advertising department. She often exercised her right to discuss union business during her breaks and during meals. Allen was on close personal terms with her immediate supervisor, Bobbie Cox. She was also at ease professionally and personally with Classified Manager Hal Greene.

---

1. 29 U.S.C. §§ 158(a)(1) and (3) provide:

§ 158. Unfair labor practices
(a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \*

    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: PROVIDED, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of

this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: PROVIDED FURTHER, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

2. Note that the date of the decision given in the reporter is incorrect.

On July 8, 1982, Greene and Allen were leaving the break room and Greene asked Allen if she knew Roberts. She said yes. Allen says that Greene commented that Roberts was involved in the union and it would not look good for her to be seen with him. Greene denies any such union-based statement.

On July 29, at approximately 5:00 p.m., Allen left her position and went to speak to Lovings. Allen said that she was apologizing to Lovings for having offended her the day before in a union discussion. Vice President Hendricks overheard part of the conversation and informed Gary Moore, Lovings' supervisor. Moore then approached Lovings and asked if they had been discussing the union; Lovings said yes. Moore left without ado. Advertising Director Spears and Bobbie Cox later met with Allen and told her not to solicit during company time. They told her solicitation on her own time is permissible. The Board ruled that the single question of Lovings constituted an unlawful interrogation, and that the meeting of Spears and Cox with Allen was an unlawful warning of Allen.

Finally, on November 28, 1982, Hal Greene called Allen into his office. Greene was concerned about Allen's attitude. Allen said that she was having trouble being the psychologist for her co-workers. Greene asked her about leaving the newspaper if the pressure increased. Greene said that Allen's attitude problem may be caused by her associates. Greene also referred to Ross Swearingen, a former employee who had become depressed. Swearingen was later discharged. After the discharge, Swearingen said he was fired because of his union work. This discussion, argues the NLRB, was a thinly disguised threat to Allen to tone down her union activities.

In large part, the Board adopted ALJ Scully's order of December 29, 1983, which required the newspaper to cease and desist from 1) threatening employees with reprisals for associating with known union adher-

ents; 2) issuing warnings to employees for participating in protected union activities; 3) threatening union employees with loss of benefits; 4) discharging employees sympathetic to the union, and 5) interfering with, restraining, or coercing employees to forego union activities. The order also affirmatively required the company to reinstate Roberts with full pay and benefits, expunge his work record, and post the appropriate notice.

Roberts was reinstated; there was peace for a time.

During 1987 the turmoil rekindled. New petitions were filed with the NLRB alleging more unfair labor practices by the company. On March 12, the General Counsel issued a complaint against the company alleging violations of section 8(a)(1), (3), and (4) of the Act because warnings were issued to Roberts and others. On July 21, the General Counsel issued another complaint against the company arguing that it violated the same sections of the Act by discharging an employee, and it violated section 8(a)(5) by refusing to bargain with the union. The NLRB argues that these continuing violations mandate judicial enforcement of the September 1984 order. We cannot agree.

## II.

The company argues that the order is moot because: 1) it has complied with the 1984 order, 2) it reinstated Roberts, and 3) because Allen is currently employed at the company. The company did not appeal the Board's decision in 1984 when it was handed down; it simply complied. Now, three years later, the Board comes to this court asking for judicial sanction of its order so that the contempt power can be added to its quiver of enforcement weapons. The Board responds that compliance with a Board order does not make the claim moot and that further violations of the order have occurred which justify judicial enforcement of the order. Rather than find that the order is moot,[3] this court exercises

---

**3.** The United States Supreme Court has ruled repeatedly that where the possibility of continuing violations exist, usually in the context of

employers' refusals to bargain in good faith, compliance with an NLRB order will not moot a claim. *See e.g. NLRB v. Mexia Textile Mills,*

its equitable and supervisory powers in denying the requested judicial enforcement. When the NLRB asks "a court of appeals to enforce the Board's order, it is appealing to the court's equitable powers and is subject to some, at least, of the traditional defenses to requests for equitable relief." *Continental Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1095 (7th Cir.1984). This court can, in its supervisory role, decline to enforce a Board order if the action sought in the order is unnecessary or futile. *NLRB v. Maywood Plant of Grede Plastics*, 628 F.2d 1, 7 (D.C.Cir.1980). *See also Cagle's Inc. v. NLRB*, 588 F.2d 943, 951 (5th Cir. 1979) and *Brockway Motor Trucks v. NLRB*, 582 F.2d 720, 740 (3rd Cir.1978).

We are constrained to deny enforcement of this order because it is both unnecessary and obsolete. First, we refuse to enforce the 1984 order because the more than three year delay taken by the NLRB before petitioning this court, *see Continental Web Press*, 742 F.2d at 1095, and widespread personnel changes in the plant have made the 1984 order unnecessary. In *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the United States Supreme Court explained that although discontinuance of conduct sought to be enjoined will not usually suffice to prevent injunctive relief, such relief is inappropriate if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated in the future.[4] What is more, the party seeking the injunction "must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." 345 U.S. at 633. This threshold showing was never made in this case.

The Board's order pertaining to the 1982 allegations was entered on September 19, 1984; the Board has waited until recently to appear before this court to ask that we bestow our judicial imprimatur on the order. The Board has offered no reason for the delay. If the delay were attributable in whole, or in significant part to the employer, we would enforce the order nonetheless so as not to encourage delaying tactics. Here the company challenged the ALJ findings and decided to abide by the Board's ruling. The Board has only itself to blame for this delay.

Further, the persons involved in the complaints from 1982 are wholly different, except for Roberts, from those involved in the 1987 complaints. The 1987 complaints allege wholly different injuries than were found to exist in the 1982 order. The 1987 complaint argues that the company was restricting the movement of employees; the 1984 complaint and order never mention such activities.[5] Also, the 1987 complaint alleges the wrongful failure to bargain with the union; this was never mentioned in the 1984 order. These differences militate against using the recent allegations as justification to enforce a three-year-old order. Without the 1987 allega-

339 U.S. 563, 567, 70 S.Ct. 826, 828, 94 L.Ed. 1067 (1950) and *NLRB v. Raytheon Co.*, 398 U.S. 25, 27, 90 S.Ct. 1547, 1548, 26 L.Ed.2d 21 (1970). However, this court, as well as other circuit courts of appeal, has ruled that under certain circumstances, the dispute underlying an NLRB order can become moot. *See NLRB v. Fourco Glass Co.*, 646 F.2d 863, 864 (4th Cir.1981).

4. *W.T. Grant* does not specifically address the enforcement of NLRB orders. The case involved a suit brought by the United States to enjoin one Hancock from holding directorships in several competing corporations, and the corporations themselves, from violating the provisions of the Clayton Act prohibiting interlocking corporate directorates. The court's discussion of the use of injunctions to deter future misconduct has direct implications in cases involving the enforcement of NLRB orders, and the Court has cited *W.T. Grant* in later cases where enforcement of NLRB orders are at issue. *See NLRB v. Raytheon Co.*, 398 U.S. 25, 27, 90 S.Ct. 1547, 1548, 26 L.Ed.2d 21 (1970).

5. We recognize that, in 1983, there was testimony concerning alleged restrictions on Roberts' movements, and that this was discussed by the ALJ. In determining whether to enforce the 1984 order, however, we are concerned only with the terms of the order and the facts on which that order was based. In light of the absence of the allegation that the company was restricting employees' movements from both the complaint and the reasons ultimately asserted as the basis for the 1984 order, the 1987 allegation must be deemed new and unrelated.

tions, there is no showing that there is a need to enforce the 1984 order. Delay, coupled with the wholly new thrust of the new allegations involving new personnel, renders enforcement of the 1984 order unnecessary. *NLRB v. Jamaica Towing, Inc.,* 602 F.2d 1100, 1104 (2d Cir.1979); *Continental Web Press, Inc. v. NLRB,* 742 F.2d 1087, 1085 (7th Cir.1984); and *NLRB v. Marion Rohr Corp. Inc.,* 714 F.2d 228, 232 (2d Cir.1983).

Second, we refuse to enforce the 1984 order because it is obsolete. At oral argument, counsel for the Board explained that judicial enforcement of the 1984 order would have absolutely no effect on the alleged 1987 violations. In response to the question from the panel, "Suppose we were to grant enforcement of this order, what would be your position as to what impact that grant of enforcement would have on this pending appeal ...? Counsel for the Board replied "None, your honor, none." Ultimately, then, if this court enforces the 1984 Board order, nothing will have changed. The Board has charges currently pending against the company for its alleged unfair practices which occurred in 1987 and judicially rubber-stamping the findings of the 1984 order will not prove or disprove the recent allegations, nor will it enable the Board to seek contempt sanctions against the company for the 1987 allegations. At some point the Board should be required to start the process anew; file a complaint, obtain an ALJ determination, review the case itself, then petition this court in a timely manner. In this case, the Board completed the first three steps and ended the process. Now, over three years later, the Board seeks to reopen the 1984 order even though such reopening will have no significant effect. Such maneuvers are at best, inefficient, and at worst, useless. *NLRB v. Globe Security Services, Inc.,* 548 F.2d 1115, 1117 (3rd Cir.1977) (enforcement of orders which have no effect on the rights of the parties are "vain and useless.") and *NLRB v. Maywood Plant of Grede Plastics,* 628 F.2d 1, 7 (D.C.Cir.1980) ("It is neither wise nor proper for the Board to petition this court to enforce an order which has become

unenforceable or senseless at the time when enforcement is sought.")

Although we refuse to enforce the NLRB order from 1984, we do so without prejudice to the Board to commence and pursue additional proceedings should it seek to do so. We leave open the possibility of the Board seeking judicial enforcement of any order resulting from the 1987 allegations. But as for this order

ENFORCEMENT DENIED.

BUTZNER, Senior Circuit Judge, dissenting:

On January 4, 1985, the Regional Director wrote the following letter to the Greensboro News Company:

The Respondent [Greensboro News], having satisfactorily complied with the affirmative requirements of the Order [entered in 1984] in the above-numbered cases, and the undersigned having determined that Respondent is also in compliance with the negative provisions of the Order, the files in these matters are hereby closed, and will be continued as closed cases so long as the present status of compliance continues.

In accordance with the assurances expressed in the letter, the NLRB did not seek to enforce its order while compliance continued.

Following its initial compliance, however, the company engaged in conduct that caused the General Counsel to issue complaints on March 12, 1987, and July 21, 1987. The first complaint alleges that the company violated section 8(a)(1), (3), and (4) of the Act by issuing warnings to Roberts, the same employee who is involved in the case presently before us, because of his union activities and because he cooperated with the Board. The complaint also charges that the company restricted the movements of its employees because of their union activities. The second complaint alleges that the company violated section 8(a)(3) and (1) of the Act by discharging an employee because of his union activities and section 8(a)(5) and (1) by refusing to bargain. The allegations of both

complaints describe conduct that does not comply with the cease and desist order entered in 1984.

After the General Counsel issued the first 1987 complaint, the Board sought enforcement of its 1984 order. The company responded that the case is moot. In its brief it framed the issue, which the parties have addressed, in these terms:

> Whether enforcement of the National Labor Relations Board's order should be denied as the issues underlying this controversy are now moot.

The company does not contend, nor in my opinion could it, that if the case is not moot it should nevertheless prevail on this issue.

The Board relied on sound precedent to support its petition for enforcement. In *NLRB v. Mexia Textile Mills, Inc.*, 339 U.S. 563, 567–68, 70 S.Ct. 826, 828–29, 94 L.Ed. 1067 (1950), the Court said:

> We think it plain from the cases that the employer's compliance with an order of the Board does not render the cause moot, depriving the Board of its opportunity to secure enforcement from an appropriate court.... A Board order imposes a continuing obligation; and the Board is entitled to have the resumption of the unfair practice barred by an enforcement decree.... The Act does not require the Board to play hide-and-seek with those guilty of unfair labor practices.

The facts in *Mexia* differ from those in the instant case, but the principles the Court announced are not narrowly confined to similar factual patterns. This is illustrated by *NLRB v. Raytheon Co.*, 398 U.S. 25, 27, 90 S.Ct. 1547, 1548, 26 L.Ed.2d 21 (1970). There the Court, quoting the extract from *Mexia* that is set forth above, applied the principles explained in the quotation to facts different from those in *Mexia*.

To be sure, *Raytheon* recognizes that a court may deny enforcement when the case is moot. 398 U.S. at 27, 90 S.Ct. at 1548 (dictum); *see also NLRB v. Fourco Glass Co.*, 646 F.2d 863 (4th Cir.1981). But this case is not moot. Compliance with the Board's order "does not render the cause

moot...." *Mexia*, 339 U.S. at 567, 70 S.Ct. at 828.

The Board's policy of deferral, exemplified by the Regional Director's letter of January 4, 1985, has obvious advantages for employers, employees, unions, and the Board. I am loathe to disapprove it by denying deferred enforcement. The perception that its policy is ineffective in this circuit may prompt the Board to seek enforcement regardless of compliance with the attendant inconvenience and expense that litigation imposes.

Section 10(e) of the Act, 29 U.S.C. § 160(e), which authorizes the Board to seek enforcement of its orders and confers jurisdiction on the courts of appeals, contains no statute of limitations or provision for laches. I would not, certainly not in the circumstances presented by this case, engraft these defenses on the Act. Instead, I would adhere to section 10(e) and consider the substance of the Board's petition and the company's other defenses.