66 F.3d 328
 150 L.R.R.M. (BNA) 2192
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
ORE-IDA FOODS, INCORPORATED, Petitioner and Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner.
 Nos. 94-3282, 94-3503.
 United States Court of Appeals, Seventh Circuit.
 Argued June 2, 1995.
Decided Aug. 21, 1995.
 
 Before CUMMINGS, KANNE and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 In order to challenge what it considered an improper designation of a maintenance-only bargaining unit, Ore-Ida Foods, Inc. ("Ore-Ida") refused to bargain with the United Food & Commercial Workers Union, Local 73A (the "Union") despite the Union's certification by the National Labor Relations Board ("the Board") as the exclusive bargaining representative of the maintenance employees at Ore-Ida's Plover, Wisconsin plant. Ore-Ida now seeks review of the Board's decision that a maintenance only unit is appropriate and the Board seeks enforcement of its order requiring Ore-Ida to bargain with the Union. Both claims hinge on the single issue whether the Board acted outside its discretion in determining that a bargaining unit which includes maintenance but not production employees is appropriate.
 
 Background
 
 2
 Ore-Ida's Plover plant produces processed potato products. The plant's 549 production employees are part of the manufacturing department; they process and package potatoes on one of three production lines. The plant's 69 maintenance employees, 64 of whom voted for the union, are part of a separate technology support department. Some maintenance employees work the same three shifts as production employees and are responsible for keeping the production lines operating. Another group of utility maintenance employees maintain the building and non-production facilities.
 
 
 3
 All maintenance employees have a particular area of expertise. Some are boiler and refrigeration mechanics, others are electronic technicians, electricians, or machinists. Some of these specialties require an associate's degree or equivalent industrial experience. Since 1992 all new maintenance employees and others seeking advancement have been required to participate in an apprenticeship program which includes 500 hours of course work at a local technical college and 8000 hours of on-the-job training. While approximately 20 of the plant's maintenance employees began as production employees, no production employee has made the transition since the institution of the apprenticeship program and no employee has ever gone from maintenance to production.
 
 
 4
 Maintenance employees in shift groups are assigned to shops or bench areas away from the production lines though they typically spend half or more of their time in production areas inspecting equipment or solving immediate problems with malfunctioning equipment on the line. Production employees may assist with these on-the-spot repairs and may perform minor maintenance or adjustments on their own. During plant shutdowns a limited number of production employees are retained as "maintenance assistants" and perform minor maintenance tasks.
 
 
 5
 The plant's pay scale ranges from 1 to 10. Most production employees are in grades 1 to 8. Only production "lead workers" are in grade 9. Most maintenance workers are in grades 9 and 10. Maintenance workers have their own maintenance supervisors who are responsible for their direction and discipline; production supervisors may in some instances direct maintenance employees to perform a particular repair or line changeover, usually after conferring with a maintenance supervisor.
 
 Discussion
 
 6
 "[T]he National Labor Relations Act vests the Board with primary responsibility for determining the appropriateness of a collective bargaining unit." N.L.R.B. v. Aaron's Office Furniture Co., Inc., 825 F.2d 1167, 1169 (7th Cir.1987). The Act supplies no standard for making this determination but the Board has created its own "community of interest test." See Continental Web Press, Inc. v. N.L.R.B., 742 F.2d 1087, 1089. In determining whether the members of a unit have a sufficient community of interest, the Board traditionally considers several factors including organizational structure; similarity of functions, skills, wages, hours and working conditions; common supervision; and interchange between employees. See NLRB v. Bay Shipbuilding Corp., 721 F.2d 187, 190-191 (7th Cir.1983); NLRB v. Gogin, 575 F.2d 596, 603 n. 12 (7th Cir.1978).
 
 
 7
 In the present case the Board determined that maintenance employees had, because of their distinct role in the plant's organization and operation and their greater skills, training, and pay, a community of interest sufficiently separate from production employees so that a maintenance-only bargaining unit was appropriate. In reviewing the Board's determination, our role is not to reweigh the evidence, but only to guard against arbitrary actions. Aaron's Office Furniture, 825 F.2d at 1169. The Board's decision would be arbitrary if it contradicted announced policy, which it does not--the Board has long held that maintenance only units may be appropriate, see American Cyanamid Co., 131 NLRB 909 (1961)--or was otherwise unreasonable, e.g., by directing "that a homogeneous work force be broken up into separate units." Continental Web Press, 742 F.2d at 1091.
 
 
 8
 After reviewing the record, we find the Board's decision to be reasonable and supported by substantial evidence. In its attempt to undermine the Board's finding of a functional distinction, Ore-Ida points to instances in which certain production employees performed tasks that were also done by maintenance workers. It is natural that production employees who operate a machine day in and day out will to varying degrees learn to adjust and troubleshoot it. That this occurs at Ore-Ida's Plover plant, and that some of the more ambitious operators learn to make adjustments and minor repairs also performed by maintenance mechanics, does not render arbitrary the general distinction between production employees who operate machines and maintenance employees who fix them.
 
 
 9
 Ore-Ida similarly attacks the Board's finding of separate supervision, citing instances in which production supervisors have requested or directed maintenance employees to make particular repairs in order to get a production line up and running. This argument is equally unavailing. The purpose of Ore-Ida's plant is to turn out processed potatoes. When that process grinds to a halt, one would expect that distinctions in the chain of command would take a back seat to the immediate goal--keeping the line in operation.
 
 
 10
 The evidence Ore-Ida cites only shows that the line between maintenance and production is to some degree a fuzzy one, as are all lines which draw general distinctions between groups of individual employees. Ore-Ida has not shown, nor can it, that the distinction is in general an arbitrary one. The Board's determination is therefore affirmed and its order enforced.