**AMERICAN HOSPITAL ASSOCIATION, Plaintiff–Appellee,**

v.

**NATIONAL LABOR RELATIONS BOARD, James M. Stephens, Mary M. Cracraft, John E. Higgins, Jr., Dennis M. Devaney, and John C. Truesdale, Defendants,**

**and**

**American Nurses Association, American Federation of Labor and Congress of Industrial Organizations, and Building and Construction Trades Department, AFL–CIO, Intervening Defendants–Appellants.**

Nos. 89–2604, 89–2605 and 89–2622.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1990.

Decided April 11, 1990.

---

Brian W. Bulger (argued), Laurence H. Lenz, Jr., Michael W. Duffee, Gail A. Chaney, Daniel S. Kaufman, Katten Muchin & Zavis, Chicago, Illinois; Benjamin R. Civiletti (argued), Venable, Baetjer & Howard, Baltimore, Maryland, for plaintiff-appellee.

Eric G. Moskowitz, Diane Rosse, Norton J. Come, Linda R. Sher, N.L.R.B., Washington, D.C., William G. Kocal, N.L.R.B., Chicago, Ill., for defendants-appellants.

Joel A. D'Alba, Marvin Gittler, Barry M. Bennett, Asher, Gittler & Greenfield, Peggy A. Hillman, Chicago, Ill., Laurence Gold, David Silberman, Michael Fanning, Richard Griffin, George Kaufman, Woody N. Peterson, Dickstein, Shapiro & Morin, Laurence J. Cohen, Victoria Bor, Sherman, Dunn, Cohen, Leifer & Counts, Washington, D.C., for intervenors-appellants.

Lawrence Rosenzweig, Santa Monica, Cal., for amicus curiae, Union of American Physicians and Dentists.

E.J. Holland, Jr., Peggy F. Schmitt, Spencer, Fane, Britt & Browne, Kansas City, Mo., for amicus curiae, Missouri Hosp. Ass'n.

Laurence R. Arnold, Weissburg & Aronson, San Francisco, Cal., for amicus curiae, Federation of American Health Systems.

Before POSNER, RIPPLE, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

The National Labor Relations Board, joined by intervening unions, appeals from an order by the district court enjoining the first significant substantive exertion of the rulemaking powers conferred on the Board, almost half a century ago, by section 6 of the National Labor Relations Act, 29 U.S.C. § 156. By "substantive," we mean other than jurisdictional, procedural, or remedial.

Section 9(b) of the Act, 29 U.S.C. § 159(b), directs the Board to determine in each case the appropriate unit for collective bargaining. The rule that the district court enjoined provides that, save in extraordinary circumstances, the Board will recognize the following, and only the following, eight bargaining units for employees of acute-care hospitals: physicians, registered nurses, other professional employees, medical technicians, skilled maintenance workers, clerical workers, guards, and other nonprofessional employees. *Collective–Bargaining Units in the Health Care Industry*, 52 Fed.Reg. 25142 (1987) (notice of rulemaking), 53 Fed.Reg. 33900 (1988) (further notice), 54 Fed.Reg. 16336 (1989) (final rule), enjoined, 718 F.Supp. 704 (N.D.Ill. 1989). No unit, however, will be certified that has fewer than six employees. The rule is limited to acute-care hospitals, but does not differentiate among them by size or location except insofar as the six-employee minimum may prevent the forma-

tion of all eight units in the smallest hospitals. Section 9(b) itself entitles guards to form their own separate unit, 29 U.S.C. § 159(b)(1), so we may assume that the six-employee minimum does not apply to guards (the Board's rule is silent on the question). But a hospital would still have to have a minimum of 43 employees for all eight bargaining units to be recognized in it—one guard plus six employees in each of the other seven units. The statute also entitles professional employees to bargain separately from nonprofessional employees, 29 U.S.C. § 159(b)(1), but there will always be more than six professional employees in a hospital or other facility covered by the rule.

■ The hospital industry objects to any rule that requires the recognition of more than the statutory minimum of three units—professional employees, guards, and other nonprofessional employees. Which is to say that it objects to any rule at all, since no rule is necessary to confer rights already conferred by the statute.

Labor and management are perennially and systemically at odds over the appropriate number of bargaining units. *NLRB v. Res–Care, Inc.*, 705 F.2d 1461, 1468–71 (7th Cir.1983); *Continental Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1090 (7th Cir.1984); Note, *The National Labor Relations Board's Proposed Rules on Health Care Bargaining Units*, 76 Va.L.Rev. 115, 117–18, 121–22 (1990). From organized labor's standpoint, generally the more units there are the better. This is because the smaller and more homogeneous a bargaining unit is, the easier it will be for the members to agree on a mutually advantageous course of collective action, and therefore the more attractive a union will be, unionization being the vehicle for collective action by employees. By the same token, the larger and more heterogeneous the unit is, the harder it will be for the members to agree on a common course of action. The diversity of, often amounting to conflict between, the interests of the members of a large and heterogeneous unit will make collective action difficult, so it will be hard for a union to gain majority support in such a unit or,

having gained it, to use it to bargain effectively (for example, by making a credible threat to strike). This is the union's perspective; the employer's perspective is different. The more units there are, the more costly it will be for the employer to negotiate collective bargaining contracts. And work stoppages will be likelier, because there will be more separate decision-making centers each of which can call a strike, and because majority support for a strike call is more likely the more homogeneous a unit is and hence the likelier all members are to benefit if the union wins.

■ In making unit determinations the Board is thus required to strike a balance among the competing interests of unions, employees (whose interests are not always identical with those of unions), employers, and the broader public. The statute, though otherwise nondirective, can be read to suggest that the tilt should be in favor of unions, and hence toward relatively many rather than relatively few units. *NLRB v. Res–Care, Inc., supra*, 705 F.2d at 1469; but see 29 U.S.C. § 159(c)(5); *Continental Web Press, Inc. v. NLRB, supra*, 742 F.2d at 1090–91. The statute states: "The Board shall decide in each case whether, *in order to assure to employees the fullest freedom in exercising the rights guaranteed by* [the National Labor Relations Act], the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." 29 U.S.C. § 159(b) (emphasis added). It is true that among the rights that the Act explicitly confers on workers is the right not to organize. 29 U.S.C. § 157. But even with the Taft–Hartley amendments this is not the *principal* right of workers under the National Labor Relations Act. The principal purpose of the Act was and is to protect workers who want to organize for collective bargaining.

■ In any event, the precise balance among the competing interests is certainly not spelled out in the statute; it is for the Board to decide. *NLRB v. Res–Care, Inc., supra*, 705 F.2d at 1469; *Continental Web Press, Inc. v. NLRB, supra*, 742 F.2d at

1090. The decision is particularly difficult and delicate in the health care industry because the work force of a hospital (or nursing home or rehabilitation center) tends to be at once small and heterogeneous. It may include physicians, registered nurses, psychologists, licensed practical nurses, nurses' aides, lab technicians, orderlies, physical therapists, dieticians, cooks, guards, clerical workers, maintenance workers, and others—but often only a few of each. If the desirability (from the union standpoint) of homogeneous units is stressed, even a hospital of average size might have ten or twenty or even more units, each with a bare handful of workers. The cost of the institution's labor relations and the probability of work stoppages would soar. Wages might soar too (depending of course upon competition among hospitals), since proliferation of units fosters unionization and a principal objective of unions is to raise their members' wages. But this is far from certain; workers do not receive wages when they are on strike, and strike-prone workers are worth less to employers.

Work stoppages, heavy bargaining costs, soaring wages, labor unrest—all these are matters of concern in a period of high and rising costs of health care, and indeed, as we shall see, commanded congressional attention even before the tide came in. The sorting out and weighing of these matters are judgmental functions committed to the Board.

■ The Board's rulemaking power is explicit and broad. Section 6 provides: "The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of [the National Labor Relations Act]." (The reference to the APA was added in 1947; the rest of the provision dates back to the original Act.) The industry does not argue that the power is confined to nonsubstantive matters or has atrophied from disuse, and there is broad although not unanimous agreement in the legal community, which we and other courts have remarked approvingly, that the exercise of the Board's dormant substantive rulemaking power is long overdue. *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 765 n. 3, 89 S.Ct. 1426, 1429 n. 3, 22 L.Ed.2d 709 (1969); *id.* at 769–80, 89 S.Ct. at 1431–32 (concurring opinion); *NLRB v. Res–Care, Inc., supra*, 705 F.2d at 1466; *Continental Web Press, Inc. v. NLRB, supra*, 742 F.2d at 1093–94; *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 859–61 (2d Cir.1966) (Friendly, J.); *International Union of Operating Engineers v. NLRB*, 353 F.2d 852, 856 n. 16 (D.C.Cir.1965); Peck, *A Critique of the National Labor Relations Board's Performance in Policy Formulation*, 117 U.Pa.L.Rev. 254 (1968); Morris, *The NLRB in the Dog House*, 24 San Diego L.Rev. 9, 27–42 (1987); Shapiro, *Why Do Voters Vote?*, 86 Yale L.J. 1532, 1543–45 (1977); cf. *Mosey Mfg. Co. v. NLRB*, 701 F.2d 610, 612 (7th Cir.1983) (en banc); but see Williams, *The NLRB and Administrative Rulemaking*, 16 Inst. Labor L. 209 (1970). We are speaking of explicit rulemaking; the Board also of course has long made rules in common law fashion, case by case, and its power to make rules this way is no longer open to doubt. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974). Its rulemaking power is not less when it proceeds, under the explicit authority of section 6, in accordance with the procedures that the Administrative Procedure Act prescribes for rulemaking.

■ There is, however, a question whether the Board is authorized to make a rule recognizing eight separate bargaining units in the acute-care hospital industry. The district judge thought not, and the industry defends his conclusion on three separate grounds. The first is based on the text of section 9(b): "The Board shall decide [the appropriate unit] *in each case*" (emphasis added), implying, the industry argues, that the Board must determine the appropriate unit on a case by case basis, except for the irreducible minimum of three units authorized by the statute itself. We do not interpret the statute so, and note that such interpretations are regularly rejected in decisions involving challenges to

agency rules, such as the Social Security Administration's "grid" method of deciding entitlement to disability benefits. *Heckler v. Campbell,* 461 U.S. 458, 467–68, 103 S.Ct. 1952, 1957–58, 76 L.Ed.2d 66 (1983). The reference in section 9(b) to employer, craft, and plant units suggests that the term "in each case" was included to prevent the Board from bringing about a revolution in unit determinations by prescribing employer units, or craft units, or plant units for all employers under the Board's jurisdiction. At the time the Wagner Act was passed, there was an enormous diversity of bargaining units, in major part reflecting the different characters of the two major labor federations, the AFL and the CIO—the former a federation of craft unions, the latter of plant unions. If the Board had ruled that all bargaining units should be craft units or that all should be plant units, it would have altered the balance of power between the federations dramatically. The "in each case" proviso forbids the Board to do this. But it is consistent with the background and semantics of the proviso that a "case" can be an industry or (as here) a subset or submarket of an industry; it need not be a particular dispute between a particular employer and a particular union at a particular plant or establishment.

Another possibility is that "in each case" simply expresses the truism that, whether or not the Board proceeds by formal rulemaking, it still must determine the bargaining units in each case in which there is a dispute over how to classify particular workers. In other words, a rule, like a statute, is applied case by case. Still another possibility is that "case" means "proceeding" in a sense broad enough to cover a rulemaking proceeding as well as an adjudicative one.

The legislative history of "in each case" is scanty, but the House Reports do say that "section 9(b) provides that the Board shall determine ... [the appropriate unit]. This matter is obviously one for determination in each individual case, and the only possible workable arrangement is to authorize the impartial governmental agency, the Board, to make that determination." H.R.

Rep. No. 972, 74th Cong., 1st Sess. 20 (1935); H.R.Rep. No. 1147, 74th Cong., 1st Sess. 22 (1935). In context, all this appears to mean is that unit determination is a task meet for the Board rather than for either the Congress or the employees themselves. And since three sections earlier in the National Labor Relations Act, in a provision (section 6) enacted at the same time as section 9(b), Congress had granted the Board explicit rulemaking power, it is probable (no stronger statement is possible) that Congress would have made an explicit exception for unit determination if it had wanted to place that determination outside the scope of the Board's rulemaking power.

The industry makes no argument that unit determination is inherently less suitable for rulemaking than any of the other dimensions of labor relations regulated by the Board. Nor is the procedure the Board has followed the focus of the industry's challenge; the industry would have objected just as vigorously if the Board had announced the rule in an adjudicative proceeding, as it has announced virtually all of its substantive rules until this one. The broad discretion that the statute grants the Board in the matter of unit determination is an invitation to the Board to bring order out of chaos through rules, and rulemaking is often and perhaps here a superior method of making rules than adjudication is. Since there is no reason why Congress might have wanted to carve out unit determinations from the grant of rulemaking power in section 6 and no indication beyond the ambiguous semantics of the word "case" that it did want to do this, we conclude that unit determination is not excepted from the Board's power under that section.

■ The second ground on which the industry urges us to uphold the injunction is that the Board's rule is inconsistent with the following statement in the congressional committee reports accompanying the Health Care Amendments Act of 1974:

Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry.

In this connection, the Committee notes with approval the recent Board decisions in *Four Seasons Nursing Center*, 208 NLRB No. 50, 85 LRRM 1093 (1974), and *Woodland Park Hospital*, 205 NLRB No. 144, 84 LRRM 1075 (1973), as well as the trend toward broader units enunciated in *Extendicare of West Virginia*, 203 NLRB No. 170, 83 LRRM 1242 (1973).[1] S.Rep. No. 766, 93d Cong., 2d Sess. 5 (1974), U.S.Code Cong. & Admin.News 1974, pp. 3946, 3950; H.R.Rep. No. 1051, 93d Cong., 2d Sess. 6–7 (1974). (The footnote states: "By our reference to *Extendicare* we do not necessarily approve all of the holdings of that decision.") The background and application of this passage are discussed exhaustively in the majority and concurring opinions in *International Brotherhood of Electrical Workers v. NLRB*, 814 F.2d 697 (D.C.Cir.1987), allowing us to be brief.

Before the 1974 amendments, nonproprietary (i.e., non-profit) hospitals—which dominated the hospital industry then even more than they do now—were not subject to the Board's jurisdiction, and, possibly as a result, there was little union activity in the hospital sector. Naturally the industry opposed the extension of the Board's jurisdiction to the nonproprietaries, but not having the muscle to defeat the extension focused its efforts on securing provisions to require ten-day advance notice of strikes and to limit the number of bargaining units (one proposal was to limit the number to four). Union interests opposed both provisions. The result of the collision of interest groups was a compromise whereby advance notice of strikes was required, 29 U.S.C. § 158(g); *East Chicago Rehabilitation Center, Inc. v. NLRB*, 710 F.2d 397, 401–04 (7th Cir.1983), but no change was made in the unit-determination statute. However, the industry did succeed in persuading the members of the House and Senate committees to include in the committee reports the admonition concerning unit proliferation that we have quoted.

■ Ordinarily a committee report that is not explaining new or altered statutory language has little significance in the interpretation of a statute. *Public Employees Retirement System v. Betts*, —— U.S. ——, 109 S.Ct. 2854, 2861, 106 L.Ed.2d 134 (1989). Suppose a congressional committee issued a report expressing disagreement with a decision by the Supreme Court interpreting a provision of the Sherman Act unchanged since 1890. The report might be a persuasive document by virtue of the cogency of its reasoning but it would have no *legislative* significance. Congress legislates by passing bills and sending them to the President for his signature. It does not legislate by issuing committee reports. *Prussner v. United States*, 896 F.2d 218, 228 (7th Cir.1990) (en banc); *In re Sinclair*, 870 F.2d 1340 (7th Cir.1989). Postenactment legislative history (an oxymoron—the history of an event lies in its past, not its future) is sometimes a sneaky device for trying to influence the interpretation of a statute, in derogation of the deal struck in the statute itself among the various interests represented in the legislature. *Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1438–39 (7th Cir.1988); *In re Tarnow*, 749 F.2d 464, 467 (7th Cir.1984). Courts must be careful not to fall for such tricks and thereby upset a legislative compromise.

■ If, however, Congress does enact a statute, the committee reports explaining it may have considerable significance in guiding interpretation. We say this fully aware that a growing number of judges disagree. They regard committee reports (and *a fortiori* the rest of legislative history—hearings and rejected bills and floor debate) as illegitimate efforts to influence judicial interpretation. We reviewed this skeptical literature in *In re Sinclair, supra*, 870 F.2d at 1343–44, but we did not endorse it, noting that "clarity depends on context, which legislative history may illuminate." *Id.* at 1342. The expressed purposes of the drafters of statutory language can assist in interpretation, especially of ambiguous language. Sometimes a committee report is designed to give a statute a spin not intended by a majority of the Congress that enacted it or by the President that signed it, *Green v. Bock Laun-*

*dry Machine Co.,* —— U.S. ——, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (concurring opinion); *Hirschey v. FERC,* 777 F.2d 1, 7 n. 1 (D.C.Cir.1985) (concurring opinion), but the extent of this abuse remains unclear. For divergent views on its prevalence, see Judges and Legislators: Toward Institutional Comity 170–75 (Katzmann ed. 1988). Judges should be alert to the possibility of abuse, but should also be careful not to throw out the baby with the bathwater.

The admonition in the 1974 committee reports is certainly not a statute, *Mary Thompson Hospital, Inc. v. NLRB,* 621 F.2d 858, 864 (7th Cir.1980) (dissenting opinion), and courts that have treated it as such have in our view erred. (The dissent thought the majority had done that in *Mary Thompson,* but we do not read the majority opinion so—its concern was with what seemed the Board's willful refusal even to consider the admonition or the case law in determining bargaining units in the health-care industry.) The admonition lies between the polar cases of a committee report that does not accompany legislative action and a committee report that explains a newly enacted or amended statute, but is we think closer to the latter. It accompanied the enactment of substantial amendments. The particular statutory provision to which the admonition was addressed was not amended, but the effect of the amendments was to apply that provision for the first time to the nonproprietary hospital industry. Section 9(b) directs the Board to determine the "appropriate" unit, and what is appropriate may differ from one industry to another—may therefore "mean" something different in one industry from what it means in another. So in changing the domain of application of section 9(b), the 1974 amendments may have changed its meaning without changing its words. The admonition can therefore be regarded as a commentary on the meaning of the 1974 amendments and hence as equivalent to pre-enactment legislative history, rather than as a gratuitous comment unrelated to legislative action—the case in *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490 (1988), and *Center*

*for Auto Safety v. Peck,* 751 F.2d 1336, 1351 (D.C.Cir.1985).

And yet the fact that the hospital industry would have dearly loved to amend the unit-determination provision yet failed to do so must give us pause in treating the "admonition" as if it were a statute, which anyway it plainly is not. To treat it as one would give the hospital industry something it tried and failed to win from Congress. Moreover the admonition does not *read* like a statute. It is cautionary rather than directive. It expresses a concern felt by many members of Congress, including those who were responsible for shepherding the bill through both houses, and such an expression is entitled to our respectful consideration, not only for its intrinsic merits but also for what light it sheds on Congress's intentions in the 1974 amendments. But it is not an amendment to section 9(b), decreeing that in the health-care industry no more than three separate bargaining units shall be authorized.

It could not properly be so interpreted even if it were a statute, rather than a statement in committee reports. The background against which the committees expressed their concern with unit proliferation was one to which the word "proliferation" far more compellingly applied than it does to the eight units (three statutory) prescribed in the Board's rule. There are many more than eight groups of hospital employees who consider themselves to have common interests distinct from those of the other groups. Congress was told that New York State's counterpart to the NLRB had recognized more than 21 separate bargaining units in the hospitals of New York. Hearings on H.R. 11357 Before the Subcomm. on Labor of the S. Comm. on Labor and Public Welfare, 92d Cong., 2d Sess. 300–01 (1972). *That* is proliferation; that is the sort of unit metastasis that "due consideration" could be expected to persuade the Board to disallow. The cases cited in the admonition were ones in which the Board had rejected minuscule or arbitrary units of specialized nonprofessional employees. The rejected unit in *Four Seasons Nursing Center,* 85

L.R.R.M. 1093 (1974), had only two members. In *Woodland Park Hospital*, 84 L.R.R.M. 1075 (1973), the rejected unit consisted of X-ray technicians, and the Board found that they were no different in material respects from the other technicians employed by the hospital. And in *Extendicare of West Virginia, Inc.*, 83 L.R.R.M. 1242 (1973), the Board rejected the employer's request for a single bargaining unit, instead recognizing separate units of technical employees, service and maintenance employees, and licensed practical nurses. Even if we indulge the heroic assumption that members of Congress had actually read the cases, but see *Friedrich v. City of Chicago*, 888 F.2d 511, 517 (7th Cir.1989), neither the cases cited in the admonition nor the admonition itself reads on the issue of the propriety of eight units. So it is merely a detail that the footnote to the admonition makes the committee's view of *Extendicare* completely inscrutable.

At argument we pressed counsel for examples of cases in which, either before or after 1974, the Board or a court had deemed the failure to combine workers from two or more of the eight separate units recognized by the Board's rule—say, clerical workers with maintenance workers, or licensed practical nurses with orderlies, or psychologists with physical therapists—a manifestation of proliferation. No examples were forthcoming. The term has always had reference to finer divisions of the health-care work force than attempted in the rule under challenge.

The last ground on which the industry defends the injunction is that the Board's rule is arbitrary because it lumps together hospitals of different sizes and missions in different locations. *All* acute-care hospitals are covered, from the smallest rural hospital having at least six employees in one or more of the prescribed units to the largest metropolitan hospital. This is an important criticism but it would impress us more if the industry had proposed an alternative that recognized the diversity of the industry but preserved the virtues of a rule; the only alternative it proposed is a rule that would state a rebuttable presumption that the three statutorily separate units are appropriate. Such a rule is no rule. It simply assigns to the unions the burden of persuading the Board to allow more units than the statutory minimum. There is no basis for placing this burden on the unions, especially given the statutory declaration that unit determination is to be guided by the desirability of maximizing the bargaining freedom of the employees.

Another way in which the industry failed to respond constructively to the Board's desire to bring unit determination in the acute-care hospital industry under a rule was by failing to press for an increase in the six-employee minimum. If the minimum were, say, fifteen, the effect would be to confine the rule to the larger hospitals. But the industry did not ask the Board to fix a higher minimum. Quite the contrary, it joined the unions in opposing a proposed distinction between hospitals having more than one hundred beds and hospitals having fewer. 53 Fed.Reg. at 33927.

The lumping together of all acute-care hospitals into one category for purposes of prescribing proper bargaining units does of course overlook a great deal of relevant diversity. What the hospital industry refuses to acknowledge is that this is the very nature of rules. A rule makes one or a few of a mass of particulars legally decisive, ignoring the rest. The result is a gain in certainty, predictability, celerity, and economy, and a loss in individualized justice. Often the tradeoff is worthwhile; at least the prevalence of rules in our legal system so suggests. The hospital industry is acutely conscious of the costs of rules, but disregards the benefits. Because of the absence of statutory guidance and the complexity and uncertainty of the balance that the Board is required to strike in order to determine an appropriate unit, unit determination when made on a case by case basis has all the disadvantages of discretionary justice.

For its first forty-four years the Board tried to channel its discretion over unit determination in common law fashion, proposing and modifying standards case by

case. That was the approach it took when the nonprofit health care sector was brought under its aegis in 1974. The approach is widely regarded as a failure, not least by the courts of appeals, including this court; certainly the Board was entitled to regard it as such. "Thirteen years and many hundreds of cases later, the Board finds that despite its numerous, well-intentioned efforts to carry out congressional intent through formulation of a general conceptual test, it is now no closer to successfully defining appropriate bargaining units in the health care industry than it was in 1974." 52 Fed.Reg. at 25143. Against this dismal background it was not unreasonable for the Board to experiment with substituting a tight rule for a loose standard. Necessarily the result would be a suppression of relevant detail. Although the rule is not as simple as it could be—it does not cover the entire health-care industry but only acute-care hospitals, and it leaves an open-ended exception for cases in which a party can demonstrate exceptional circumstances—it could of course be less simple. It could differentiate among acute-care hospitals by size, location, or mission (e.g., primary versus secondary versus tertiary care hospitals). The Board considered these possibilities but decided against them. It gave plausible reasons for its choice.

The decision how complex to make a rule—that is, how many exceptions to recognize—is judgmental, like the decision whether to make rules by formal rulemaking or by the common law method of case-by-case adjudication. *NLRB v. Bell Aerospace Co., supra*, 416 U.S. at 290–95, 94 S.Ct. at 1769–72. The decision how much discretion to eliminate from the decisional process is itself a discretionary judgment, entitled to broad judicial deference. *Heckler v. Campbell, supra*, 461 U.S. at 467–68, 103 S.Ct. at 1957–58; *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir.1970) (Friendly, J.); *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1501 (D.C.Cir. 1988). It is not for us to fine-tune the regulatory process by telling the Labor Board that its rule should make slightly more distinctions than it does, or slightly

fewer. The Board did a responsible job of weighing the conflicting arguments, and we therefore uphold its rule without pretending that we consider it Utopia. And there was no statutory obstacle to the Board's bringing the unit-determination process in the hospital industry under the aegis of a rule.

The injunction is vacated with directions to enter judgment for the Board.

REVERSED.