JON LITSCHER, Secretary Department of Employment Relations
You ask whether the federal Civil Rights Act of 1991, Pub.L. No. 102-166, 1991 U.S.C.C.A.N. (105 Stat.) 1071 (the CRA), which was enacted November 21, 1991, invalidated Wisconsin's expanded certification program as authorized by section 230.25, Stats. The only provisions of the CRA which appear to have that potential are sections 106 and 107 of the CRA. Though judicial and administrative interpretations of the CRA should be monitored as they are made, the answer presently appears to be no.
1. Status Before the CRA.
Voluntary affirmative action which is race, sex, color or national origin "conscious" has long been recognized by the EEOC and others as an essential means of achieving the mandate of42 U.S.C.A. § 2000e et seq. (West 1981) (Title VII) that employment decisions are to be made without discriminating based on those factors.[1] See e.g., 41 C.F.R. § 60-3.17 (1991). Though sometimes misperceived as favoring one group over another, voluntary affirmative action is intended to be a corrective for past and present discrimination and to level the playing field for all. Id.
Since 1978 the EEOC rules as to Title VII have considered affirmative "race, color, sex or ethnic `conscious'" steps designed to remedy exclusionary selection procedures to be *Page 265 
appropriate voluntary affirmative actions under Title VII including:
 The initiation of measures designed to assure that members of the affected group who are qualified to perform the job are included within the pool of persons from which the selecting official makes the selection;
29 C.F.R. § 1608.4 (c)(1) (1991). The same language is contained in "Uniform Guidelines on Employee Selection Procedures" which were adopted in 1978 by various federal agencies including the EEOC. 41 C.F.R. § 60-3.17 (3)(e). Apparently the "EEOC is not planning action over the next six months with respect to its Uniform Guidelines on Employee Selection Procedures" even though the "Guidelines have come under fire from various groups in the past year." OFCCP and EEOCAgendas, Fair Empl. Prac. Summary of Latest Developments (BNA) at 51 (May 11, 1992).
In filling positions within the Wisconsin classified service, examinations are scored and those scores result in a "register of eligibles" — namely those who have received passing scores on the examination. Secs. 230.16 and 230.25, Stats. Discrimination based on, among other things, race, sex, color and national origin, in the examination and scoring processes and in the preparation of this "register of eligibles" is explicitly prohibited and the Wisconsin statutes contain no exception to these prohibitions. Sec. 230.18, Stats. When appointing authorities notify the Department of Employment Relations (DER) of a vacant position in the classified service, DER certifies, from the "register of eligibles" appropriate to that position, the names of those then on the register with the top 5 to 10 scores. Sec. *Page 266 
230.25 (1), Stats.[2] Additional names may be certified based on veteran's preference points. Sec. 230.25 (2), Stats.
If, and only if, the appointing agency requests expanded certification "in order to comply with an approved affirmative action plan or program," DER may respond to that request by doing one or more of the following: "[c]ertifying up to 3 names of persons belonging to at least one of one or more specified racial or ethnic groups" or "[c]ertifying up to 3 names of persons of a specified gender." Sec. 230.25 (1n), Stats.
Expanded certification can be viewed as a voluntary affirmative action measure designed to assure that women and minorities who are qualified to perform a job — having received an initial "qualified" ranking — are "included within the pool of persons from which the selecting official makes the selection."29 C.F.R. § 1608.4 (c)(1). There is no requirement that women or members of any minority group actually be hired or even given any special consideration but simply that qualified female and minority candidates be given an interview. Sec. 230.25 (1n), Stats. The Wisconsin statutes and rules appear to assume appointing authorities have adopted affirmative action measures — including expanded certification (sec. 230.25 (1n) — pursuant to the EEOC guidelines. Compare, e.g., secs.230.01 (2), 230.03 (2), 230.14 (1), 230.18, 230.19 and 230.24
(2), 230.25 (1n), Stats., and Wis. Admin. Code §§ ER 43.01, *Page 267 ER 43.02 (2m) (5) (1988), and ER 43.03 (1988) with29 C.F.R. §§ 1608.1 through 1608.12 (1991) and 41 C.F.R. Part 60-3 (1991). It is assumed for purposes of this opinion that Wisconsin's overall voluntary affirmative action programs, and the specific plans adopted by each agency, are based on proper documentation, methodologies and validations under the EEOC Guidelines.[3]
The Supreme Court observed, in Firefighters v. Cleveland,478 U.S. 501, 515-16 (1986), that:
 We have on numerous occasions recognized that Congress intended voluntary compliance to be the preferred means of achieving the objectives of Title VII. [Citations omitted.] . . .
 It is equally clear that the voluntary action available to employers and unions seeking to eradicate race discrimination may include reasonable race-conscious relief that benefits individuals who were not actual victims of discrimination. This was the holding of Steelworkers v. *Page 268 
Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480
(1979).
 2. The plain and ordinary meaning of the terms in section 106 of the CRA does not prohibit Wisconsin's expanded certification procedures and, to the extent there may be any ambiguity, legislative history indicates expanded certification is not prohibited.
In determining whether section 106 of the CRA unambiguously prohibits Wisconsin from continuing to use its expanded certification procedures, there are several key terms, underlined below, to examine:
 (1) It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, . . . sex, or national origin.
42 U.S.C.A. § 2000e-2 (1) — section 106 of the CRA — (emphasis added).
Engaging in expanded certification is taken "in connection with the selection or referral of applicants" (id.) such that it falls within the general bounds of section 106 of the CRA. It is not clear, however, that the other underlined terms contemplate expanded certification.
There are three different practices prohibited by section 106. Employers may not, in their selection or referral practices: (a) adjust the scores of employment related tests, (b) use different cutoff scores for employment related tests, or (c) otherwise alter the results of employment related tests based on race, sex, color or national origin.
a. Is expanded certification an "employment-related test"?
All three of the practices prohibited by section 106 of the CRA are governed by the meaning of "employment-related test." The plain and ordinary meaning of the word "test" as *Page 269 
otherwise used in Title VII indicates that Congress intended it to mean a measuring device rather than to apply broadly to all selection procedures. In Albemarle Paper Co. v. Moody, 422 U.S. 405, 425-26
(1975), McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-02
(1973) and Griggs v. Duke Power Co., 401 U.S. 424, 433 (1971), for example, the Supreme Court construed 42 U.S.C.A. § 2000e-2
(h) and its regulation of tests and consistently considered the term "test" to mean a measuring device. Albemarle,422 U.S. at 425-26; McDonnell, 411 U.S. at 801-02; Griggs, 401 U.S. at 433.
The EEOC, through its adoption of uniform guidelines as to selection procedures, has established that the term "test" has a meaning far narrower than "selection procedure." See41 C.F.R. § 60-3.1 (B) (1991); 41 C.F.R. § 60-3.2 (C) (1991). In the context of these guidelines, expanded certification appears to be a "selection procedure" but not a "test." Id. See alsoWilliams v. City and County of San Francisco, 483 F. Supp. 335,339-40 (N.D. Cal. 1979).
The most applicable dictionary definition appears to conform with these court and agency constructions of the meaning of "test" in Title VII. Webster's Third New International Dictionary of the English Language Unabridged 2362 (1986). ("3 a: a technique for measuring objectively an individual's personal characteristics, potentialities, or accomplishments. . . .")
In the Wisconsin civil service process, there appear to be two processes that can be considered "tests" within the meaning of Title VII: (1) the initial examinations to determine who is qualified on a threshold basis to be listed on a "register of eligibles" (section 230.16) and (2) interviews and any testing that may be conducted during interviewing to actually measure relative qualifications of certified candidates. The process of certification does not itself appear to be an "employment-related test" within the meaning of Title VII. See sec. 230.25, Stats. *Page 270 
If there is any ambiguity about whether the term "employment-related test" was intended to include procedures such as expanded certification, the legislative history as to section 106 of the CRA appears to preclude that potential. The bill from which much of the language of the CRA was drawn was H.R. 1, 102d Cong., 1st Sess. (1991) which the House passed in June 1991. Representative Edwards, the chair of the subcommittee which examined H.R. 1, prepared an "interpretive memorandum" noting that the language in S. 1745, 102d Cong., 1st Sess. (1991) — which became the CRA — for the most part tracked the language in H.R. 1 but that there were differences which merited explanation. 137 Cong. Rec. H9526-32 (daily ed. November 7, 1991). While section 116 of H.R. 1 had used the term "written employment test," section 106 of the CRA, as Representative Edwards points out, uses the term "employment-related test." 137 Cong. Rec. H9529. Representative Edwards indicates in his "interpretive memorandum" that efforts to make a test "employment-related" by assuring the test treats all applicants equally are not prohibited. 137 Cong. Rec. H9529-30.
b. Are scores adjusted through expanded certification?
Neither "adjust" nor "scores" are defined in the CRA. In the absence of a definition in the statute itself or a court-approved definition,[4] reference to a dictionary to confirm the plain, ordinary, and commonly understood meaning of the terms is appropriate. See, e.g, Torti v. United States, 249 F.2d 623,625-26 (7th Cir. 1957).
Of the various meanings ascribed to "adjust," the ones that seem to fit closest with the use of this term in section 106 of the CRA are: "3a . . . (2): to rearrange the relationship of components of (a watch movement) after complete assembly *Page 271 
. . . b: to change the position of (as for better fit or appearance)." Webster's at 27. Of the meanings ascribed to "score[s]," the ones that seem to fit closest with Congress' use of this term in section 106 of the CRA are:
 9: a number expressing the degree of success in a psychological or educational test in terms of the amount performed or of the time required or of the difficulty surmounted or of the accuracy and excellence of the performance 10: a numerical rating of quality . . . that usu[ally] is made on the basis of 100 as a perfect rating and is arrived at by adding numerical values assigned according to some definite scheme to specific significant characteristics.
Webster's at 2036.
Assuming "adjust" and "scores" were used by Congress in these senses, must the act of certifying, for interview, additional names of candidates previously determined to be qualified necessarily be characterized as adjusting the scores of any candidate? At a minimum, the statutory language does not unambiguously require an affirmative answer as a result of which legislative history may be consulted. In the Wisconsin civil service system, "scores" may be obtained at two points in the selection process: (1) as a result of the initial qualifying examination and (2) as a result of the interviews and any accompanying testing during the interviews. No separate "score" is granted during the certification process. See sec. 230.25, Stats. It may be argued that the actual scores received by the qualified candidates as a result of the initial qualifying examination are "rearranged" or that their positions are changed through the act of expanded certification. One could, however, legitimately argue that, since the arrangement and positions of the qualifying names remain the same on the register of eligibles — and that the scores themselves remain the same — expanded certification simply involves picking additional names off of the register without adjusting the scores in any way. *Page 272 
At a minimum, the plain and ordinary meanings of "adjust" and "scores" do not so unequivocally encompass expanded certification (see, e.g, Mills v. United States, 713 F.2d 1249, 1255, n. 4 (7th Cir. 1983); Torti, 249 F.2d at 625-26) that legislative history should not be examined.[5]
The legislative history appears to confirm that section 106 of the CRA was not intended to prohibit expanded certification. The evil section 106 of the CRA was designed to prevent, according to that legislative history, was the practice of "race-norming." The predecessor to section 106 of the CRA — section 116 of H.R. 1 — was known as "the Hyde Amendment." In the Judiciary Committee report issued on H.R. 1, Rep. Hyde and other dissenting members analyzed the "Hyde Amendment," which had been rejected by the committee. Civil Rights Act of 1991, H.R. Rep. No. 40 II, 102d Cong., 1st Sess. at 60-65 (1991) reprinted in
1991 U.S.C.C.A.N. 694. It is clear that the focus of the "Hyde Amendment" was to prohibit "race-norming" — a practice of actually changing scores through grouping of races before those scores are reported to hiring authorities. Id. at 63-65. The minority report defined this practice as follows:
 Under the race norming practice, all candidates take the same test. But, for scoring purposes, these candidates are *Page 273 
divided into three separate categories, based upon the person's racial or ethnic heritage. Their actual scores are then computed as a percentile score within his or her own racial or ethnic group (black, Hispanic, and other). So, the resulting final score, which goes to a prospective employer, is the adjusted or converted score. A person's score under this system really reflects how that person's score compares with others of his/her own racial or ethnic group. Because a person is confined to his/her percentile with a particular racial or ethnic group, the percentage-based scores distort an individual's performance. Frequently, the adjusted scores of black or Hispanic candidates are higher than whites who actually scored better on the underlying GATB test.
Id. at 64. Though there were no published committee reports on the CRA itself, this committee report on H.R. 1 provides considerable guidance into legislative intent in the enactment of section 106 of the CRA since the language is largely the same as that found in the Hyde Amendment, section 116 of H.R. 1. When courts go beyond the face of a federal statute to determine its meaning, committee reports are, the Seventh Circuit has held, "generally the most reliable indicators of congressional intent."Monterey Coal, 743 F.2d at 598. The Seventh Circuit has frequently reiterated this holding. See, e.g, Mills v. UnitedStates, 713 F.2d 1249, 1252 (7th Cir. 1983); N.L.R.B. v. Res-Care,Inc., 705 F.2d 1461, 1470 (7th Cir. 1983); Miller v.Federal Mine Safety Health Review Com'n, 687 F.2d 194, 195 (7th Cir. 1982).
The Seventh Circuit has cautioned that committee reports are useful only in explaining "new or altered statutory language" (American Hospital Ass'n v. N.L.R.B., 899 F.2d 651, 657 (7th Cir. 1990)), that a report by only one committee of the house merely "express[ing] an `expectation'" that rules will be issued by an agency does not establish congressional intent (Scalise v.Thornburgh, 891 F.2d 640, 644-45 (7th Cir. 1989)), and that a committee report may not be used to overrule the clear direction *Page 274 
contained in the statute itself (Squillacote v. United States,739 F.2d 1208, 1218 (7th Cir. 1984)). Nonetheless, committee reports can be "the most persuasive indicia" (Mills,713 F.2d at 1252) and "powerful evidence of legislative intent" (Miller,687 F.2d at 194).
That the Hyde Amendment was directed at "race-norming" was reiterated during the House floor debate on that Amendment. E.g., 137 Cong. Rec. H3876 (daily ed. June 4, 1991); 137 Cong. Rec. H3930 (daily ed. June 5, 1991) (Representative Hyde stating that race-norming was "a method of adjusting or altering the results
of employment aptitude tests)." See also the discussion of "race-norming" in Bridgeport Guardians, Inc. v. City of Bridgeport,735 F. Supp. 1126, 1137 (D. Conn. 1990).
The conclusion that section 106 of the CRA was intended to be restricted to prohibiting "race-norming" and variants on "race-norming" is confirmed by other indicia of congressional intent as well. An important interpretive memorandum was placed in the record by Senator Danforth and was explicitly "intended to reflect the intent of all of the original cosponsors to S. 1745 [which was enacted as the CRA] with respect to those issues" addressed. 137 Cong. Rec. S15483-84, (daily ed. October 31, 1991). Among the issues expressly addressed were those raised by section 106 of the CRA. This interpretive memorandum confirms that the focus of section 106 of the CRA was to prohibit "race-norming" and that it only applied where tests were determined to be "employment-related." Id. Of importance to the impact on expanded certification, the sponsors' interpretive memorandum also stated section 106 of the CRA "does not purport to affect how an employer accurately reported test scores." Id.
An interpretive memorandum by Representative Hyde — the original sponsor of section 116 of H.R. 1 (the Hyde Amendment) which was the predecessor to section 106 of the CRA — confirms that the focus of section 106 of the CRA was *Page 275 
intended to prohibit actually changing test scores and not necessarily how accurately reported test scores were used. 137 Cong. Rec. H9542-49 (daily ed. November 7, 1991). This was reiterated in Rep. Edwards' interpretive memorandum, referred to previously. 137 Cong. Rec. H9526-32.[6]
Unlike "race-norming," with expanded certification the person making the selection decision is not misled into thinking that those candidates who are granted an opportunity to interview through expanded certification received a higher score than persons on the register who were not certified. Since section230.25 (1n) is a published state statute, decisionmakers are likely to assume that a female or minority candidate did not, in situations involving expanded certification, receive a score higher than candidates not certified. If anything, this would lead *Page 276 
to assumptions disadvantageous to female and minority candidates who happened to actually have the next highest score were it not for the fact that decisionmakers are instructed by DER to "give equal appointment consideration" to all candidates who are certified. Wisconsin Personnel Manual — Staffing, Vol. 2, p. 232-13, ch. 232, "Certification," § 232.054 (I)(A) (Rev. 11/84).
The legislative history of section 106 appears to confirm that prohibiting the adjustment of scores of "employment-related tests" was not intended to prohibit expanded certification.
c. What does it mean to use different "cutoff" scores?
Congress' intended meaning of the term "scores" in section 106 of the CRA has just been examined. What did Congress mean in using the term "cutoff?" Once again, "cutoff" was not defined in the CRA and does not appear to have obtained a definitive legislative or judicial meaning. Though used as an adjective in section 106, Webster's definitions for "cutoff" used as a verb appear more applicable: "3: INTERCEPT, STOP: stop the passage of . . . 4: to shut off: BAR (the fence cut off his view) . . . 6: SEPARATE, ISOLATE" Webster's at 561. One federal case which defined a term using "cutoff" prior to the enactment of the CRA appeared to use it in this sense. United States v. WarmspringsIrr. Dist., 38 F. Supp. 239, 241, nn. 4 (D. Ore. 1940) ("`In cutoff drainage, for draining seepy hillsides, tiles are placed along the hillside to intercept the seep water and prevent its reaching the bottom land.' Merriam Webster Dictionary, `Drainage'").
In this sense, is it unambiguously clear that Congress intended to prohibit expanded certification by making the use of different "cutoff" scores an unlawful employment practice? Since the act of expanded certification does not appear to involve establishing any different "cutoff" scores, it does not appear so. A "cutoff" score is established, for example, as a result of the initial qualifying examination (normally a score of 70 out of 100) and the register of eligibles includes only those *Page 277 
who receive a score of 70 or more. Those who do not are separated or isolated from the process at that point and cannot be brought back onto that register thereafter.
This is the sense in which the Seventh Circuit recently used the term "cutoff" in analyzing an equal protection challenge to an affirmative action program in Billish:
 The eighteen promotions were made in rank order from the 1979 eligibility list, and each of the promotees was white. Soon thereafter, Commissioner Galante inquired of the City Personnel Department whether there were any black or Hispanic lieutenants remaining on the 1979 list. He was told there were two minority lieutenants on the list but, because both had scored below the cut-off-score of 70, that cut-off-score would have to be lowered before they could be eligible for promotion to captain. Commissioner Galante asked the Personnel Department to lower the passing score.
Billish, 962 F.2d at 1275 (emphasis added).
The certification process, by contrast, is subject to variations in the number and types of names certified and — potentially — to using up the entire list of qualified candidates. Wisconsin Personnel Manual — Staffing, Vol. 2, pp. 232-12 and 232-13, ch. 232, "Certification," § 232.053 (Rev. 11/84). Expanded certification does not, therefore, establish a different "cutoff" score than was established through the initial examination. Certification is normally a process of determining who will be initially interviewed and frequently results in several names being added as candidates from the pool of qualified candidates on one or more occasions because some candidates initially certified either cannot be contacted or decline invitations to interview. Id.
It cannot be said that Congress unambiguously intended to prohibit expanded certification by prohibiting the use of different cutoff scores in section 106 of the CRA. Legislative history may, therefore, be consulted. The legislative history *Page 278 
analyzed in the prior section suggests that expanded certification was not among the evils section 106 of the CRA sought to prohibit by proscribing the use of different cutoff scores. Indeed, Sen. Kennedy observed that "the substitute also provides that a test cutoff score, the minimum passing scorenecessary to be eligible to be considered for selection or referral should not vary with the race, color, religion, sex or national origin." 137 Cong. Rec. S15235 (daily ed. October 25, 1991) (emphasis added).
 d. What does it mean to otherwise "alter" the "results" of a test?
The most applicable dictionary definition of "alter" is "1: to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing into something else . . . (preserve it as it is or . . . [alter] it out of all recognition — Aldous Huxley)." Webster's at 63. To "alter" has been defined by the federal courts in different contexts to essentially mean taking action which actually makes a substantive change. See, e.g, UnitedStates v. Sacks, 257 U.S. 37, 41-42 (1921); Porter v.Commissioner of Int. Rev., 288 U.S. 436, 443 (1933); Hutt v.Gibson Fiber Glass Products, Inc., 914 F.2d 790, 794 (6th Cir. 1990); West Texas Utilities Co. v. N.L.R.B., 206 F.2d 442, 446
(D.C. Cir. 1953), cert. denied, 346 U.S. 855 (1953).
The most applicable dictionary definitions of "result" or "results" used as a noun appear to be: "3: something obtained, achieved, or brought about by calculation, investigation, or similar activity . . . 4 results pl: a synoptic publication of the outcome of related competitive events (the race [results] are on the back page) (have you seen the football [results])." Webster's at 1937. It is likely that, what Congress meant by altering test results is something similar to what the Seventh Circuit meant in U.S. v. City of Chicago, 870 F.2d 1256 (7th Cir. 1989) by "altering the test scores" (id. at 1261), i.e., "assigning the same mean score to each group of exams graded *Page 279 
by a different reader" to "standardiz[e] for `rater bias'" and "by raising the mean score of the black and Hispanic sergeants who had taken the test to that of the white sergeants" (id. at 1258).
Three state court decisions defining "results" in the context of "tests" are also of assistance. Reynolds v. State, 424 A.2d 6,7 (Del. 1980) (a pretrial agreement that "results" of a truth serum test would be admissible did not include a tape recording of the entire interview and related procedure but simply some confirmation or negation of defendant's version of the facts),People v. Rhodes, 102 Misc. 2d 377, 423 N.Y.S.2d 437, 438 (1980) (conclusion as to whether a defendant was truthful is a "result" of a polygraph test while statements made during pretest interview and during examination itself are not); State v.Blosser, 558 P.2d 105, 107 (Kan. 1976) (the "results" of a polygraph test are "the examiner's opinion based upon his interpretation of the data shown by the machine").
In the context of these definitions, it does not appear that expanded certification alters or changes the results of the initial examination process. The "scores" received remain the same. Indeed, the list which reports the "results" of the initial qualifying test remains the same. All that happens is that candidates with scores further down the list are interviewed rather than candidates with scores higher on the list. Once again, section 106 of the CRA does not so unambiguously prohibit expanded certification that legislative history cannot be examined. To the extent there is any ambiguity, that legislative history, analyzed previously, suggests that Congress did not intend, by barring employers from altering the results of employment-related tests, to prohibit expanded certification.
 3. The plain and ordinary meaning of the terms in section 107 of the CRA does not prohibit Wisconsin's expanded certification procedures and, to the extent there may be any ambiguity, legislative history indicates expanded certification is not prohibited. *Page 280 
The plain and ordinary meaning of the terms of section 107 do not so unambiguously prohibit expanded certification that legislative history cannot be examined. 42 U.S.C.A. § 2000e-2(m) — section 107 of the CRA — states:
 (m) Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, . . . sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.
(Emphasis added). Only if it is unambiguously clear that the phrase "any employment practice" was intended both to include expanded certification and to prohibit expanded certification would consultation with legislative history be unavailing. In determining the plain meaning of this provision, however, the terms used cannot be interpreted in a vacuum and must instead be interpreted in the context of the statute as a whole. See, e.g,Crandon v. United States, 494 U.S. 152 (1990).
Section 116 of the CRA states, in relevant part, that: "Nothing in the amendments made by this title shall be construed to affect . . . affirmative action . . . that [is] in accordance with the law." The EEOC guidelines explicitly allow race, color, sex or national origin to be a "motivating factor" in "employment practices" which are within the scope of affirmative action. It is not unambiguously clear, therefore, both that expanded certification is an "employment practice" within the meaning of section 107 of the CRA and that Congress intended, by section 107 of the CRA, to prohibit that practice. Legislative history may be consulted.
The interpretive memorandum of Rep. Edwards, the chair of the subcommittee which examined H.R. 1, interprets section 107 of the CRA in a way which excludes expanded certification from its coverage. That memorandum explicitly stated that the purpose of section 107 of the CRA was to overrule "one aspect of the Supreme Court's decision in Price-Waterhouse v. *Page 281 Hopkins, 109 S.Ct. 1775 (1989)" namely, to eliminate the "mixed motive" defense and to make it a violation of Title VII if a discriminatory reason was a factor in the employment action even if other reasons justified the employment action. 137 Cong. Rec. H9529. That memorandum went on to note that:
 It is our clear understanding that this section is not
intended to provide an additional method to challenge affirmative action. As Section 116 of the legislation makes plain, nothing in this legislation is to be construed to affect . . . affirmative action . . . that [is] otherwise in accordance with the law. This understanding has been clear from the time this legislation was first proposed in 1990, and any suggestion to the contrary is flatly wrong.
Id. (emphasis added).
Representative Hyde, in an interpretive memorandum, agreed that section 107 of the CRA addressed the Price-Waterhouse case and, although he took the view that section 107 of the CRA could be applied in cases challenging "affirmative action plans," he limited that potential application to "challenges to unlawful
affirmative action plans." 137 Cong. Rec. H9542-49 (emphasis added).
This legislative history confirms that section 107 of the CRA was not intended to prohibit voluntary affirmative action otherwise allowable under Title VII. Indeed, it appears that the purpose of section 107 of the CRA was not to create any new prohibitions at all but simply to clarify, in light of thePrice-Waterhouse decision that, if illegal discrimination was a motivating factor, it is no defense that the action would have been taken anyway. See Officers for Justice, 1992 U.S. Dist. LEXIS 3098, at *3, n. 2 (N.D. Cal. March 3, 1992) appeal pending (construing "`in accordance with the law'" in section 116 of the CRA as referring to the prohibitions of section 107 of the CRA "would render section 116 meaningless and empty.") *Page 282 
In deciding whether to interpret sections 106 or 107 of the CRA as prohibiting what has been, until now, a valid and accepted method of combatting discrimination through voluntary affirmative action, Justice Blackmun's remarks in his concurring opinion inWeber are instructive:
 Absent compelling evidence of legislative intent, I would not interpret Title VII itself as a means of "locking in" the effects of discrimination for which Title VII provides no remedy.
Weber, 443 U.S. at 215 (Blackmun, J., concurring).
It is recognized that the question you pose implicates an area of federal law which remains unclear and which is still developing. It is also recognized that, regardless of which way your question is answered, litigation may well result. Although, as noted earlier, judicial and administrative interpretations should be monitored as these new provisions are implemented, it does not appear that section 106 or 107 of the CRA were intended to prohibit expanded certification authorized by section 230.25.
JED:RBM
[1] Title VII and Wisconsin's affirmative action statutes overlap as to race, sex, color and national origin/ethnicity.42 U.S.C.A. § 2000e et seq.; secs. 230.18, 230.25, Stats.; Wis. Admin. Code § ER 43.01 (1988).
[2] Frequently, particularly with older registers, appointing authorities are informed by persons so certified that they are no longer interested in or available for employment. In the event this would leave the appointing authority with less than five candidates, the appointing authority may request DER to provide an additional name as to each person reported to no longer be interested or available. Wisconsin Personnel Manual —Staffing, Vol. 2, pp. 232-12 and 232-13, ch. 232, "Certification," § 232.053 (Rev. 11/84). In response to each such request, to the extent names remain on the register of eligibles, DER certifies the name of the person with the next highest score on the register of eligibles. Id. If the register of eligibles from which the original names were certified is exhausted, further certifications can be made from related registers of eligibles. Id.
[3] As the Seventh Circuit recently reiterated, state or local affirmative action plans and programs challenged under the equal protection clause of the Fourteenth Amendment are subjected to strict scrutiny. Billish v. City of Chicago and Chicago FireFighters Union, Local No. 2 v. Daley, 962 F.2d 1269, 1276-77, 58 FEP Cases 1269, 58 EPD ¶ 41,454 (7th Cir. 1992), citing toCity of Richmond v. Croson Co., 488 U.S. 469, 493-94, 520 (1989) and Wygant v. Jackson Board of Education, 476 U.S. 267, 279-80,285-86 (1986). To pass muster under this strict scrutiny standard, state or local affirmative action plans and programs must be justified by a compelling governmental interest and narrowly tailored to serve that interest. See, e.g, Billish,962 F.2d at 1276-77, citing to City of Richmond, 488 U.S. at 505-08
and Wygant, 476 U.S. at 274.
You have not asked that I evaluate the extent to which any of the numerous affirmative action plans or programs maintained by State of Wisconsin appointing authorities which might underlie requests for expanded certification are potentially violative of the equal protection clause. I have made no attempt to do so in this opinion and am simply assuming, for purposes of this opinion, that those plans would not be violative of the equal protection clause.
[4] Congress may have been using these words in the sense in which the Seventh Circuit analyzed the alteration of test scores as an affirmative action method in an equal protection case, namely by actually raising scores. United States v. City ofChicago, 870 F.2d 1256, 1261 (7th Cir. 1989).
[5] Even if the language unambiguously prohibited expanded certification, it might still be appropriate to consult legislative history to determine whether this was Congress' intent. Several courts have held that persuasive contrary legislative history can and should be consulted even where the meaning of a federal legislative provision is plain on its face.See, e.g., Belland v. Pension Benefit Guaranty Corp., 726 F.2d 839,844 (D.C. Cir. 1984), cert. denied, 469 U.S. 880; MontereyCoal Co. v. Federal Mine Safety and Health Review Comm'n,743 F.2d 589, 595 (7th Cir. 1984); Peare v. McFarland, 577 F. Supp. 791,794-95 (N.D. Ind. 1984), aff'd 778 F.2d 354 (7th Cir. 1985). The plainer the language of the statute, the more convincing the contrary legislative history must be (see, e.g., Monterey Coal,743 F.2d at 595; Peare, 577 F. Supp. at 794-95) but a court is not precluded from examining legislative history simply because a federal statute is plain on its face.
[6] The few courts which have referred to section 106 of the CRA have noted that its purpose was to ban "race-norming." See,e.g, Luddington v. Indiana Bell Telephone Co., 966 F.2d 225, 229
(7th Cir. 1992), Judge Posner, in analyzing retroactivity issues and noting that the CRA made more than mere technical changes, observed: "True, it does not prohibit any conduct not already prohibited by Title VII, except the practice of `race norming'(raising mean test scores of minority applicants to the mean ofthe majority). 42 U.S.C. § 2000e-2(l)." (emphasis added);Billish, 962 F.2d at 1303 (Posner, J, dissenting) (noting that the pre-CRA affirmative action as to which an equal protection challenge was being rejected involved "race-norming," Judge Posner stated "[r]ace norming has since been outlawed by the Civil Rights Act of 1991" and defined race norming in Billish as "meaning that the scores of the blacks and Hispanics were raised in order to reduce the disparity in the pass rate between them and the whites"); Dixon v. Margolis, No. 89 C 5019, 1992 U.S. Dist. LEXIS 5477, at *6 (N.D.Ill. April 14, 1992) (noting that "race norming is prohibited by the Civil Rights Act of 1991");Officers for Justice v. Civil Service Comm'n of the City andCounty of San Francisco, No. C-73-0657 RFP, No. C-77-2884 RFP, 1992 U.S. Dist. LEXIS 3098, at *4-5 (N.D.Cal. March 3, 1992), appeal pending (rejecting a challenge, based on section 106 of the CRA, to "race banding" as part of an affirmative action plan by holding that "on its face Section 106 addresses `race-norming' which is a practice distinct from `banding.' The former involves recomputation of test scores by reference to race; the latter provides a means of interpreting test scores to determine what constitutes an `equivalent performance on a particular test'"). *Page 283